506 F.2d 246
 27 A.L.R.Fed. 324, 165 U.S.App.D.C. 185
 CITIZENS COMMITTEE TO SAVE WEFM and Citizens Committee to
Save WEFM, Inc., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Appellees, GCC Communications of Chicago,
Inc. Zenith Radio Corporation, Intervenors.
 No. 73-1057.
 United States Court of Appeals, District of Columbia Circuit.
 Argued July 26, 1973.
Decided Nov. 15, 1973, Argued En Banc June 13, 1974, On
Rehearing En Banc Oct. 4, 1974, Rehearing Denied
and Rehearing En Banc Dec. 13, 1974.
 
 Harry R. Booth, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court and Thomas D. Allison, Jr., with whom Richard F. Watt, Chicago, Ill., was on the brief, for appellants.
 Joseph Volpe, III, Counsel, Federal Communications Commission, with whom John W. Pettit, Gen. Counsel, and Joseph A. Marino, Associate, Gen. Counsel, Federal Communications Commission, were on the brief, for appellees. John H. Marple, Counsel, Federal Communications Commission and Howard E. Shapiro, Atty., Dept. of Justice, also entered an appearance for appellees.
 Paul Dobin, Washington, D.C., with whom Ronald A. Siegel, Washington, D.C., and Philip J. Curtis, Chicago, Ill., were on the brief, for intervenor GCC Communications of Chicago, Inc.
 A brief was filed on behalf of The Friends of the Chicago Public Library as amicus curiae. Kenward K. Harris, Washington, D.C., entered an appearance for The Friends of the Chicago Public Library as amicus curiae.
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and ROBB, Circuit Judge.
 BAZELON, Chief Judge:
 
 
 1
 The Federal Communications Commission, without a hearing, approved the assignment of the license of a radio station and the proposal of the new licensee to change the format of the station from classical to contemporary music. The narrow question presented by the parties is whether the Federal Communications Act required the Commission to hold a hearing. But our review must also consider the First Amendment consequences of government control of format change.
 
 
 2
 * Radio station WEFM-FM has been operated in the Chicago area by the Zenith Radio Corporation since 1940. For the entire thirty-three year period the station has had a classical music format.
 
 
 3
 In March, 1972, Zenith entered into an agreement to sell the station to GCC Communications of Chicago, Inc. and sought FCC approval for assignment of the license. GCC proposed to change the musical format of WEFM from classical to contemporary music, later defined to be 'rock music.' The goal of GCC was to appeal to what it had determined to be the primary musical interests of the young adults in the Chicago area.
 
 
 4
 In June, 1972, appellants, a group of Chicago area residents, filed a Petition to Deny with the FCC, opposing the transfer because of the proposed change in format and requesting a hearing. The FCC denied appellants' request and granted the assignment of the license.[1]
 
 II
 
 5
 In recent years this Court and the FCC have begun to develop principles governing government control of format changes.[2] This Court has held that the public has an interest in the diversity of entertainment formats.[3] Consequently the Commission has had to consider format changes in its statutory determination that a proposed assignment of a license comports with 'the public interest, convenience, and necessity.'[4] Factual disputes surrounding the format change are material and if substantial become subject to the statutory requirement that a hearing be held.[5]
 
 
 6
 In this case appellants contend that substantial factual disputes exist on two issues relating to the proposed format change-- the diversity of available formats and Zenith's alleged financial losses.
 
 
 7
 As to diversity, appellants maintain that a substantial issue of fact exists as to whether the Chicago public demands and needs the continuation of classical music on WEFM as opposed to 'yet another contemporary music station.'[6] Appellants point to the numerous letters and petitions of protest which greeted the news that WEFM was about to abandon its classical format. They note that Chicago has numerous rock stations already, while the demise of WEFM will leave only one classical music station with the power to reach the entire Chicago area.
 
 
 8
 Our previous opinions and the Commission's actions indicate that the majority of format changes are left to the give and take of the market environment and the business judgment of the licensee.[7] It is only when the format to be discontinued is apparently unique to the area served that a hearing on the public interest must be held.[8] In such cases the public interest in diversity may outweigh the dangers of government intrusion into the content of programming.
 
 
 9
 In this case is is undisputed that the entire area served by WEFM is served by another classical music station, WFMT-FM.[9] Thus we are unable to find a substantial issue of fact requiring a hearing on the diversity point.[10]
 
 
 10
 Appellants also contend that a substantial issue of fact exists concerning the losses Zenith alleges it sustained during its operation of WEFM. Even assuming that such an issue would require a hearing in the absence of a substantial diversity issue, we do not find that appellants have raised a substantial issue of fact here. The Commission had sufficient evidence to support its finding that WEFM had incurred substantial losses in the period after 1965, when the station was operated on a commercial basis and not as a research and development adjunct to the Zenith corporation.[11]
 
 III
 
 11
 The current approach of this Court and the Commission, that a hearing is required only when a format becomes unavailable, must be evaluated in light of the First Amendment. Whether the issue is the fairness doctrine,[12] the nature of 'licensee responsibility,'[13] or, as here, the standards governing format change, any government effort to regulate the content of programming must be carefully scrutinized for possible interference with free expression.
 
 
 12
 Important First Amendment rights are at stake when music formats are regulated. Music and other forms of cultural expression are traditionally protected under the First Amendment.[14] In addition to its artistic value, music, both classical and popular, can be an important mode of political and moral expression.[15] There is even the possibility of repression when, for example, the lyrics of popular songs communicate controversial ideas.[16] Danger lurks in government regulation of what music can be put on the airwaves. Such regulation, ostensibly in the name of diversity, may open the door to withholding approval of transfers if the new format is more controversial than the one to be abandoned.
 
 
 13
 It is also true that complete reliance on the market may inhibit rather than promote the First Amendment goal of 'the widest possible dissemination of information from diverse and antagonistic sources.'[17] The broadcasting media may be subject to greater concentration of ownership and difficulty of access than the printed media.[18] Thus more government regulation of broadcasting may enhance the variety of political and cultural viewpoints to be heard.[19]
 
 
 14
 These First Amendment considerations have implications for decisions as to when a hearing must be held in a format change case. On the one hand, hearings may open the door to increased government regulation with the concomitant possibility of abuse. Moreover, the prospect of lengthy and costly hearings may deter new licensees from changing their format even when that change is in the public interest.[20]
 
 
 15
 On the other hand, hearings could help develop standards under which a diversity of formats could be encouraged without undue government regulation. The 'full light' of a public hearing is often the best insurance that important policies are developed for the benefit of the public, rather than the benefit of administrators and regulated industries.[21]
 
 IV
 
 16
 At present we simply do not know how to ideally resolve the conflict between diversity and freedom from regulation. Our awareness that conflicting values are at stake here is our best protection against falling into the abyss of dogmatism. We must remain open to new information and ideas. But at the present juncture and with the facts of this case, the current approach of minimizing regulation except when diversity is most seriously threatened appears to be reasonably in accord with the goals of the Federal Communications Act and the First Amendment.
 
 
 17
 Accordingly, the decisions of the Commission are
 
 
 18
 Affirmed.
 
 
 19
 ROBB, Circuit Judge, concurs in Parts I and II and in the result.
 
 ON REHEARING EN BANC
 
 20
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.
 
 McGOWAN, Circuit Judge:
 
 21
 This is a statutory review proceeding involving the Federal Communications Commission. It has been thought appropriate for en banc consideration because it presents important questions with respect to the utilization of the publicly-owned airwaves in such manner as to serve the divergent interests and tastes of the largest possible number of their owners. A Citizens Committee was organized to contest the assignment of the license of radio station WEFM (FM), Chicago, Illinois, by Zenith Radio Corporation to GCC Communications of Chicago, Inc. The FCC denied the Committee's petition to deny the application to transfer the license or, alternatively, to conduct a hearing on certain questions. 38 FCC2d 838; 40 FCC2d 233 (on reconsideration).
 
 
 22
 The case was originally heard and decided by a division of the court which affirmed the action of the Commission in authorizing the assignment of the license in issue without a hearing. Judge Fahy dissented from this disposition in an opinion which, after noting that (1) the statute (47 U.S.C. 309(e)) requires hearings to resolve factual disputes which are substantial and material and (2) the Commission in approving the assignment had relied materially and substantially upon alleged financial losses suffered by the assignor, expressed agreement with the dissenting Commissioner that 'the attribution of such financial losses to the assignor's classical musical format was a question which could not be answered without further investigation,' especially since the assignee 'continued to use the station to advertise its own manufactured products.'
 
 
 23
 We find that the Committee has raised substantial and material questions necessitating a hearing before final disposition of the transfer application, and that the present record is inadequate to support the Commission's purported public interest finding.[22] The orders of the Commission are set aside, and the case remanded for further proceedings consistent herewith.
 
 
 24
 * Since it was first licensed to Zenith in 1940, WEFM's format has always been one of classical music. For twenty-five years Zenith operated the station on an entirely non-commercial basis, at the same time using the station as a developmental adjunct to, and laboratory for, its FM receiver manufacturing business. As such, WEFM has had a distinguished history, being the first Chicago station to broadcast in high-fidelity (1953), the pioneer in stereophonic broadcasting (1959), the source of experiments leading to the FCC's national standards for multiplex (stereo) operations (1961), and the first station in its area to introduce the dual polarization antenna, which radiates both horizontal and vertical signals (1966).
 
 
 25
 The increased costs that Zenith incurred with its 1966 expansion of WEFM's studio and technical facilities caused the company for the first time 'to seek advertising support' for its operations.[23] Both the degree of Zenith's commitment to commercial operation, and the relevance of commercial benefits realized by it over and above the advertising revenues received, remain the subject of dispute, but, according to the Commission, statements filed with it show that advertising income failed to cover costs in each succeeding year.
 
 
 26
 In March, 1972, Zenith contracted to sell WEFM to GCC, a corporation organized for the purpose of the purchase, for $1,000,000.[24] Thereafter Zenith and GCC applied to the FCC for assignment of the license of WEFM to GCC. In the application GCC proposed to 'present a format of contemporary music approximately 70% Of the time,' twenty-four hours a day. In this manner, it was said, 'the applicant will contribute to the overall diversity of program services in the Chicago area.'[25]
 
 
 27
 Notice of the proposed assignment was broadcast over WEFM once daily for four consecutive days and published four times in one of Chicago's four daily newspapers. The notice identified the type of application filed, the parties (assignor and assignee) thereto, the officers and directors of each, and stated that the application was available for inspection at Zenith's offices. No mention of the proposed format change was required, and none was made. 47 C.F.R. 1.580(d).
 
 
 28
 In its petition filed with the FCC, the Committee related that the 7.5 million residents of the metropolitan area served by WEFM received classical music from no AM stations and, in the greater part of the service area, from only one other FM station, WFMT-FM.[26] It alleged that the program formats of these stations varied somewhat, but did not claim that any part of the service area would be left entirely without a classical music station.[27] The Committee asserted that it had received hundreds of letters in opposition to the sale, and that the FCC had received over 1,000 such letters. It detailed the financial relations between General Cinema Corporation and GCC,[28] alleged that General Cinema had lost $1 million from its five other radio operations the prior year, and pointed out that there was 'no indication that Zenith's management claiming losses prior to its 1970 (license) renewal instituted measures designed to produce such profit by increasing its advertising time from 2 1/2 minutes per hour to 5 or 6 minutes,' presumably standard in the industry, nor took any other step indicating that its claimed losses, which were also doubted by the Committee, occurred despite efforts to operate WEFM on a truly commercial basis. The Committee also pointed out that in its 1970 license renewal application, approved by the FCC in 1971 to run through 1973, Zenith had represented that continuation of WEFM's classical music format was in the public interest and that it would be continued.
 
 
 29
 On the basis of these and other allegations of fact, the Committee asserted that it had made out a case to deny the proposed assignment of WEFM's license on public interest grounds, or at least raised 'substantial and material question(s) of fact,' necessitating a hearing, 47 U.S.C. 309(d), about the public interest in the proposed format change, Zenith's claimed losses, and GCC's qualifications as a licensee. It also challenged the constitutional adequacy of the public notice that the assignment was pending, and that a format change was contemplated.
 
 
 30
 Zenith and GCC filed oppositions to the Committee's petition. For its part, Zenith asserted facts intended to show the bona fides of its attempt to operate WEFM on a commercial basis and the amount of its losses, said to be almost $2 million over six years. GCC controverted the Committee's assertion that it had already decided to abandon WEFM's classical music format when it agreed to purchase the station, stating that 'it was only after the study of (community) needs (which the FCC requires of each license applicant) was completed and it was determined that the station would program for the young adults of the Chicago area that it was determined that a classical music format would not be consistent with programming directed to this age group.' It also asserted that Chicago-area classical music broadcasting would be of overall higher quality when only WFMT and a strengthened WNIB shared that market than it could be with three stations competing for the classical music audience, but no facts were alleged to buttress either the premise that present service is poor or the likelihood that it would be improved by WEFM's format change.
 
 
 31
 The Committee's reply alleged that WNIB reached at most 15% Of the area served by WEFM, further questioned Zenith's claimed losses, although it alleged no specific facts to the contrary,[29] and by a later amendment, challenged the validity of GCC's community leaders survey. The Committee wrote to some fifty of the 116 representative community leaders GCC had personally interviewed in order to ascertain community needs, issues, and problems. The Committee asked each interviewee whether he or she had in fact been personally approached by GCC, had been informed of any plans to change the WEFM format to rock music, and whether they approved of that change. Twenty-four persons responded, and eighteen of these responses were submitted to the FCC. J.A. 141-158. Five said they had been told there would be a format change, but only one recalled being told that the new format would be rock music. Nine said they were not informed that any change was contemplated, and one recalled being told specifically that no change was contemplated. As it happens, all eighteen personally disapproved of the change, some quite vehemently, and one had already protested the matter in letters to Zenith and the FCC.
 
 
 32
 While the application and petition to deny were pending before the FCC, the Committee on November 20, 1972, also filed a complaint requesting that WEFM be dedicated to classical music and cultural programming so long as any licensee willing to operate it for that purpose could be found. Zenith and GCC moved that the complaint be dismissed as a pleading not provided for in the FCC rules of practice.
 
 
 33
 On December 21, 1972 the FCC issued a Memorandum Opinion denying the Committee all relief and granting the assignment application without a hearing.[30] The FCC acknowledged that it had 'received over 1,000 letters from Chicago area listeners protesting the proposed format change.' It stated however, that 'the Chicago metropolitan area is served by two additional classical music stations,' WEMT and WNIB, and that 'the issue here simply put is whether the assignee without a hearing can change the musical format of WEFM from classical music to a 'contemporary music' format where there are two other classical music stations serving Chicago and the station has been suffering continuous operating losses.'
 
 
 34
 The Commission's resolution of this issue, however, depended not on the claimed losses, but rather on its view of its own role in cases where the format to be abandoned is not unique. In these circumstances, the FCC opined, competition among broadcasters will produce the optimal distribution of formats. Citizens Committee to Preserve the Voice of the Arts in Atlanta (WGKA-FM) v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970) (hereinafter Citizens Committee of Atlanta), where this court had held that abandonment of a unique format was 'material' in gauging the public interest and that 'substantial' factual questions therefore had to be resolved in a public hearing before the assignment application could be approved as being in the public interest, was thus distinguished. In the FCC's view, abandonment of a non-unique format is not a matter affected with the public interest but a business judgment within the licensee's discretion.[31]
 
 
 35
 To hamper the licensee's discretion in this area with the ominous threat of a hearing in a case like this would only serve to discourage licensees from choosing or experimenting with a format . . .. Accordingly, we find no basis to question the applicants discretion in the choice of format . . .. 38 FCC2d at 846.
 
 
 36
 Finding the Committee's factual allegations concerning the assignee's financial structure and its parent's losses, and community leader opposition to a format change, to have been met adequately by the applicant's responses, the FCC held that there were presented no material and substantial questions of fact on which to require a hearing.[32]
 
 
 37
 Commissioner Johnson in his dissenting opinion argued that Citizens Committee of Atlanta could not be confined to instances where a unique format is involved, since the assignee in that case had alleged that another classical music station did indeed serve much of Atlanta and yet this court held that a hearing was required to determine the actual availability of the asserted alternative. The touchstone of the public interest consideration in the prior case, he insisted, was the effect of the proposed change in lessening the diversity of radio service, not necessarily the total elimination of a particular format. He would thus have required a hearing on the degree, if any, to which the assignee's proposed assistance would strengthen WNIB's service, as well as on the causal relationship between Zenith's losses and WEFM's classical music format. In addition, he charged that the majority, by adhering to its doctrine of licensee discretion in format matters, was placing on the public the burden of establishing that the assignee's format change is not in the public interest, and abdicating its responsibility to determine whether a proposed format change that would decrease the diversity of formats available to an area 'can possibly serve the public interest.'
 
 
 38
 In petitioning the FCC for reconsideration, the Committee principally argued that the Commission had failed to consider the public interest in retaining WEFM as a distinctive cultural facility,[33] disregarded the fact that the limited service area of WNIB made it an inadequate substitute for WEFM, and resolved the dispute over Zenith's losses by relying on confidential financial reports not in the record and not disclosed to the Committee. On March 22, 1973, the FCC denied reconsideration in an opinion that reiterated its view of the agency's role in non-unique format cases, affirmed that two classical music stations would still remain after a change in WEFM's format,[34] and refused to question Zenith's claimed losses since the Committee had alleged 'no facts' casting doubt upon them.
 
 
 39
 Appended to the Commission's opinion on reconsideration was an opinion entitled 'Additional Views of Chairman Burch In Which Commissioners Robert E. Lee, H. Rex Lee, Reid, Wiley, and Hook Join.' 40 FCC2d at 230. Since Commissioners Reid and Wiley did not join in the opinion on reconsideration but only concurred in the result, these 'Additional Views,' to which six of the seven FCC Commissioners adhere, take on peculiar significance. They differ from the opinion itself in being broader than the facts of the particular case, but at the same time explain the underlying analysis on which the FCC's decision in this case was based. Indeed, they were offered because the Commissioners believed 'that an explanation of the many policy considerations underlying our decision here is both appropriate and necessary.' According to the six Commissioners, the starting point for discerning the appropriate FCC policy on format choice is in striking the 'balance between the preservation of a free competitive broadcast system, on the one hand, and the reasonable restriction of that freedom inherent in the public interest standard provided in the Communications Act, on the other,' quoting FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 474, 60 S.Ct. 693, 84 L.Ed. 869 (1940). Thus:
 
 
 40
 The Commission has struck this balance by requiring licensees to conduct formal surveys to ascertain the need for certain types of nonentertainment programming, while allowing licensees wide discretion in the area of entertainment programming. Thus with respect to the provision of news, public affairs, and other informational services to the community, we have required that broadcasters conduct thorough surveys designed to assure familiarity with community problems and then develop programming responsive to those identified needs.[3]
 
 
 41
 3 Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 FCC2d 650 (1971).
 
 
 42
 In contrast, we have generally left entertainment programming decisions to the licensee or applicant's judgment and competitive marketplace forces. As the Commission stated in its Programming Policy Statement, 25 Fed.Reg.7293 (1960), 'our view has been that the station's (entertainment) program format is a matter best left to the discretion of the licensee or applicants, since as a matter of public acceptance and of economic necessity he will tend to program to meet the preferences of his area and fill whatever void is left by the programming of other stations.'
 
 
 43
 In further support of this policy, the Commissioners expressed their view of the unwisdom of 'locking' a broadcaster in to a particular format, lest it have 'the effect of lessening the likelihood that ('program formats appealing to minority tastes') will be attempted in the first place.'
 
 II
 
 44
 The Committee presses several grounds for reversal of the FCC in this court. Its principal arguments are that (1) the FCC failed to, and could not on this record, determine whether the assignment and format change would be in the public interest; (2) substantial and material questions of fact necessitate a hearing; and (3) the public notice of the impending assignment required by the FCC is insufficient on due process criteria.[35] Before turning to these arguments seriatim, we explicate very briefly the statutory scheme to which they relate, as we have had so many occasions to do at greater length in the recent past, e.g., Stone v. FCC, 151 U.S.App.D.C. 145, 466 F.2d 316, 321-323 (1972).
 
 
 45
 A. Analytic framework.
 
 
 46
 Under the Communications Act, 47 U.S.C. 309(a), the Commission must determine, with respect to each license application, whether the public interest, convenience, and necessity would be served by granting the application, and, if it determines that it would be, must grant the application.[36] Subsection (d)(1) provides that any party in interest may petition the FCC to deny the application, and that such petition 'shall contain specific allegations of fact sufficient to show . . . that a grant of the application would be prima facie inconsistent with (the public interest, convenience, and necessity).' 47 U.S.C. 309(d)(1). Subsection (d)(2) provides as follows:
 
 
 47
 (2) If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with (the public interest, convenience, and necessity), it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with (the public interest, convenience, and necessity), it shall proceed as provided in subsection (e) of this section.
 
 
 48
 Subsection (e) governs the procedures for setting the application down for a hearing and notifying interested parties, and, in the case of issues presented by a petition to deny, authorizes the FCC to assign the burden of going forward and the burden of proof.
 
 
 49
 It is clear from the face of the statute that there are two situations in which a hearing is required before the FCC is either empowered or obliged to grant an application. The first, and the only one with which this court has previously dealt, arises when substantial and material questions of fact are raised by the petition to deny. The second occurs when the Commission is 'for any reason' unable, on the basis of the application, pleadings, and officially noticeable matters, to make the requisite finding that the public interest would be served. It would seem that this situation might obtain with respect to a particular application regardless of whether anyone has intervened to oppose the application,[37] or indeed regardless of whether there are disputed fact issues as opposed to a simple need for more information. In any event, where, as here, there is a petitioner in opposition, there is certainly no barrier to its invoking both grounds in urging that a hearing is in order.
 
 
 50
 In this case, the two asserted grounds for requiring a hearing are intimately related, as an examination of the prior case law reveals. It is common ground among all hands, as it was between the majority and dissenting positions on the FCC, that the need for a hearing in this case turns largely on the reach of our decision in Citizens Committee of Atlanta, supra, which is factually like the instant case to a startling degree.
 
 
 51
 The Atlanta case also involved a proposed sale and abandonment of a classical music format. Public notice of the application produced an outcry against the format change, the FCC received a large number of protestant letters, and a citizens committee arose to intervene before the FCC in opposition. The FCC approved the application without a hearing. It relied upon the applicant's community leader survey to demonstrate informed support for the proposed change in format, determined from the applicant's surveys that the proposed programming would be in the public interest, and 'recited as a fact' that the transfer in ownership was a financial necessity. 436 F.2d at 266.
 
 
 52
 In the proceedings on reconsideration, the Atlanta committee questioned the significance of the community leader survey and alleged that the applicant had misrepresented the views of interviewees. The applicant responded with affidavits from the community leaders vouching for the accuracy of the applicant's summary of their views. Additionally, the applicant both proposed to air classical music for a portion of each evening in recognition of the expressed interest of the large number of protestants, and asserted that a station licensed to nearby Decatur, Georgia, 'adequately served the daytime needs' of Atlantans. The FCC denied reconsideration, stating that 'The case here comes down to a choice of program formats-- a choice which in the circumstances is one for the judgment of the licensee.' It took to be the fact that the Decatur station served 'a large portion of the City of Atlanta.'As in this case, in Atlanta one Commissioner (Cox) was of the view that a hearing was required. WGKA had had a classical music format for ten years; it was the only classical music station of the twenty licensed to Atlanta; and 16% Of the area audience, according to the applicant's own survey, preferred that format. Commissioner Cox characterized the proposed sale and format change as an effort not to cut losses, which he disputed, but to maximize profits, and 'did not see how the requisite public interest finding could be made short of the illumination afforded by a hearing.'
 
 
 53
 This court reversed the FCC. We held that a format change involving abandonment of a unique format, protested by a significant sector of the community, is a matter material to the public interest and thus one on which a hearing must be held if there are substantial questions of fact. Accordingly, we remanded for a hearing to determine (1) the true financial situation of the assignor, (2) the actual views of the community leaders interviewed by the assignee, and (3) the degree to which the Decatur station provided Atlantans with classical music during the daytime.
 
 
 54
 The theory underlying the court's decision in Citizens Committee of Atlanta is that the FCC does have some responsibility, under its public interest mandate, for programming content. The Commission had forsworn any such role on the theory that, because it is not authorized to be a 'national arbiter of taste,' it must rely entirely on the licensee's discretion in matters of entertainment format. As we pointed out, however, the alternatives are not so stark. 'The Commission is not dictating tastes when it seeks to discover what they presently are, and to consider what assignment of channels is feasible and fair in terms of their gratification.' 436 F.2d at 272 n. 7. In discharging its public interest obligation, the court thought it to be within the Congressional contemplation that the FCC would seek to assure that, within technical and economic constraints, as many as possible of the various formats preferred by segments of the public would be provided.
 
 
 55
 Thus, if 16% Of the populace wanted access to classical music on radio, the public interest would, pro tanto, be served by its continued availability provided that the format is not economically unviable in the particular market. If a proposed format change would introduce a new format for a larger segment of the public that is not presently being served, it could not be denied by giving disproportionate weight to the preference of the audience for classical music, but that was not the situation in Atlanta. We repeat what we said in 1970 (436 F.2d at 269):[38]
 
 
 56
 The Commission's point of departure seems to be that, if the programming contemplated by intervenor is shown to be favored by a significant number of the residents of Atlanta, then a determination to use that format is a judgment for the broadcaster to make, and not the Commission. Thus, so the argument proceeds, since only some 16% Of the residents of Atlanta appear to prefer classical music, there can be no question that the public interest is served if the much larger number remaining are given what they say they like best.
 
 
 57
 In a democracy like ours this might, of course, make perfect sense if there were only one radio channel available to Atlanta. Its rationality becomes less plain when it is remembered that there are some 20 such channels, all owned by the people as a whole, classics lovers and rock enthusiasts alike. The 'public interest, convenience, and necessity' can be served in the one case in a way that it cannot be in the other, since it is surely in the public interest, as that was conceived of by a Congress representative of all the people, for all major aspects of contemporary culture to be accommodated by the commonly-owned public resources whenever that is technically and economically feasible.
 
 
 58
 The Atlanta case was applied in two decisions of this court rendered immediately after the FCC's decision to deny reconsideration in the instant case. Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.App.D.C. 16, 478 F.2d 926 (1973), involved a proposed license assignment and format change (from 'progressive rock' to 'middle of the road' music) on a station that had experimented unsuccessfully with two formats and switched to yet a third during the pendency of the assignment application. We adhered to our holding in Citizens Committee of Atlanta that 'the public has an interest in diversity of entertainment formats and therefore that format changes can be detrimental to the public interest. Consequently, in compliance with its statutory mandate to approve only those assignment applications which it finds to serve the public interest, convenience, and necessity, . . . the Commission must consider format changes and their effect upon the desired diversity.' Id. at 928-929.
 
 
 59
 Most format changes, we observed, do not diminish the diversity available, and 'are thus left to the give and take of each market environment and the business judgment of the licensee.' In that case, however, the format proposed to be abandoned was allegedly unique and its loss would affect diversity, thereby implicating the public interest in the change. Even that would have been of no moment were it shown that the endangered format was not viable economically, but affidavits from some station employees indicated that, while the station had not yet made a profit with the recently adopted format, it was 'rapidly achieving financial viability.' We clarified the 'financial viability' constraint on the doctrine of the Atlanta case as follows (at p. 931):
 
 
 60
 The question is not whether the licensee is in such dire financial straits that an assignment should be granted, but whether the format is so economically unfeasible that an assignment encompassing a format change should be granted.
 
 
 61
 Once a proposed format change engenders 'public grumbling (of) significant proportions,' the causal relationship between format and finance must be established, and if that requires the resolution of substantial factual questions, as it did in that case, then a hearing must be held.
 
 
 62
 The result was different in Lakewood Broadcasting Service, Inc. v. FCC, 156 U.S.App.D.C. 9, 478 F.2d 919 (1973), decided the same day, because the FCC had properly found, in a 'painstakingly thorough decision,' that no substantial factual questions existed. The assignor's financial losses due to the all-news format were undisputed, as was the availability of a substantial amount of news programming on other area stations. What was really being challenged, we found, was 'not the authenticity or accuracy of the (community needs) surveys, composites, or economic reports, but rather the inferences which the Commission may draw therefrom.' Id. at 924. The question of the inferences and legal conclusions to be drawn from substantially undisputed facts, we held, is preeminently the province of the FCC and does not require the holding of an evidentiary hearing.[39] Nothing in Citizens Committee of Atlanta was to be understood to impose upon the Commission a hearing requirement where there are no substantial questions material to the public interest determination.[40]
 
 
 63
 The teaching of these decisions may be briefly summarized. There is a public interest in a diversity of broadcast entertainment formats. The disappearance of a distinctive format may deprive a significant segment of the public of the benefits of radio, at least at their first-preference level. When faced with a proposed license assignment encompassing a format change, the FCC is obliged to determine whether the format to be lost is unique or otherwise serves a specialized audience that would feel its loss. If the endangered format is of this variety, then the FCC must affirmatively consider whether the public interest would be served by approving the proposed assignment, which may, if there are substantial questions of fact or inadequate data in the application or other officially noticeable materials, necessitate conducting a public hearing in order to resolve the factual issues or assist the Commission in discerning the public interest. Finally, it is not sufficient justification for approving the application that the assignor has asserted financial losses in providing the special format; those losses must be attributable to the format itself in order logically to support an assignment that occasions a loss of the format.
 
 
 64
 B. The public interest issues.
 
 
 65
 In its petition to deny, the Citizens Committee did not attempt to portray WEFM as significantly unique in format. Of the 61 stations serving the Chicago area, WEFM, WFMT, and WNIB, all FM stations, were identified as having a 'classical music and related cultural program format,' with the qualification that 'some variation, however, exists in the program of the three stations.' J.A. 55. The importance of WNIB as an alternative source of classical music was discounted with the allegation that it reaches 'only a small part of the audience devoted to classical music,' and the letters of protest received by the FCC were said to reveal that 'the great majority of WEFM's audience believe that only one other classical music station (WFMT) is available.'
 
 
 66
 In its original decision, the FCC stated flatly that, unlike the situation in Atlanta, 'there are two other classical music stations in Chicago.' 38 FCC2d at 845. On reconsideration the FCC responded to the Committee's contention that WNIB's limited service area made it an inadequate substitute for WEFM. On the basis of an attached contour map showing the service areas of all three stations, it found that WNIB, while it does not reach anything like as great an area as WEFM, does reach 'all of the city of Chicago, its city of license.'[41] In addition, WFMT was shown to reach all of WEFM's service area, so that the withdrawal of WEFM from service to the classical music audience would not leave that segment of the public without access to classical music. Accordingly, the FCC concluded that 'this is not a 'format' change case where there is no appropriate substitute for the service being lost.' 40 FCC 2d at 226.
 
 
 67
 The FCC's assertion that abandonment of WEFM's classical music format will not leave its service area bereft of similar programming cannot be sustained on the record before us.[42]
 
 
 68
 1. The relevant service area.
 
 
 69
 We may assume that WNIB serves all of its city of license, Chicago, and, as the Commission stated, that 'secondary agreements between WNIB and GCC provide for the enrichment of the programming fare offered by WNIB and substantial assistance is to be provided in increasing that station's power.' Without further elaboration, however, it is impossible to say, and the FCC did not find, that WNIB will ultimately serve substantially the area now served by WEFM.[43]
 
 
 70
 Insofar as WNIB fails to reach the area served by WEFM, we think it is, pro tanto, not an available substitute for WEFM. The FCC's reliance on WNIB as a substitute clearly reflected its view that the public interest in format change cases is defined by the metes and bounds of the city of license. In Stone v. FCC, supra, we found it unnecessary to decide finally whether a licensee 'has a primary obligation to serve the needs and interests of its city of license,' 466 F.2d at 327, as opposed to the full service area it reaches, because the FCC had properly determined that the television licensee in that renewal case had adequately served its city of license. But we did think it 'clear that a broadcast licensee has an obligation to meet the needs and interests of its entire area of service . . .. Suburban and other outlying areas are not cities of license, although their needs and interests must be met by television stations licensed to central cities.'
 
 
 71
 We now hold that the public interest implicated in a format change is the interest of the public in the service area, not just the city of license.[44] No other view consists with our explication, here and in Citizens Committee of Atlanta, of the requirements of 'the public interest, as that was conceived of by a Congress representative of all the people.' Id.436 F.2d at 269. National Broadcasting Co. v. United States, 319 U.S. 190, 217, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).[45] In considering the availability vel non of an alternative source for a particular format, reliance on an alternative that reaches less than a substantial portion of the area served by the station to be assigned gives disproportionate weight to the interests of one portion of the public, and none at all to those of another. Unless the Commission has considered this effect, and reasonably determined that the overall public interest is, on balance, better served by this arrangement, we cannot say that it has discharged its obligation to assess and act in the public interest.[46]
 
 
 72
 2. WFMT as an alternative source of classical music.
 
 
 73
 Insofar as WNIB is not an available alternative to listeners presently served by WEFM, WFMT is the only remaining station on which the FCC could rely in support of its thesis that WEFM's abandonment of classical music does not come within the unique format doctrine of Citizens Committee of Atlanta. There is, however, a problem with the FCC's bald characterization of WFMT as a classical music station in this proceeding.
 
 
 74
 A challenge to a proposed assignment of the license of WFMT came before this court in 1968. Joseph v. FCC, 131 U.S.App.D.C. 207, 404 F.2d 207. The issue posed in that case was the propriety of the Commission's approval of the assignment, without a hearing and without an express public interest finding, from an independent broadcasting company to a corporate group that controlled several broadcast stations and newspapers. We remanded the case to the FCC for a determination of whether a grant of the assignment application would create an undue concentration of media control in contravention of the FCC's regulations and the diversification policy on which they reated.
 
 
 75
 In this court WFMT represented itself to be, and the court referred to it as, 'an award-winning fine arts station,' id. at 208, and not as a classical music station. After the hearing on remand, the proposed assignee amended its portion of the assignment application to reflect its intention, if the FCC approved, to donate a 100% Interest in WFMT to the Chicago Educational Television Association.[47] The FCC approved the application as amended. In the course of doing so, it recited that 'CETA has given assurances that it intends to cause WFMT to maintain the unique fine arts programming of the station for the benefit of the people of Chicago.' 21 FCC 2d 401, 403 (1970). Nowhere in the FCC's opinion was WFMT described as a classical music station, and it was three times described in other terms.[48]
 
 
 76
 Against this background[49] we think the Commission has an affirmative obligation to establish that WFMT is in fact a reasonable substitute for the service previously offered by WEFM before relying on the affirmative of that proposition to avoid the necessity of weighing the public interest in a change of WEFM's format. WFMT's format may have changed since the FCC received assurances that CETA would maintain it as a 'fine arts' station, or the FCC's definition of such a station may involve such substantial overlap with its definition of a 'classical music' station that they are rough substitutes. But nothing in the present record gives any indication of whether this is so. It may be noteworthy, moreover, that while WNIB's monthly program guide was made part of the record by the applicants in support of their contention that WNIB offers a service comparable to that of WEFM, neither WFMT's program guide nor a summary thereof was submitted to buttress the same thesis with respect to that station.
 
 
 77
 The substitutability of WFMT's 'fine arts' programming for WEFM's classical music format may perhaps be capable of demonstration without the benefit of a hearing. The FCC retains a discretion commensurate with its expertise to make reasonable categorical determinations. If its exercise of that discretion requires information that can best be developed in a public hearing, see Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125, 1129 (1969), or if substantial questions concerning format similarity arise with the issue thus framed on remand, however, a hearing may well be necessary to resolve this issue. Since a hearing will be required in any event on the questions discussed in II. C, infra, we see no reason why its scope should be limited to exclude the question of WFMT's substitutability for WEFM.
 
 
 78
 C. Questions of fact requiring a hearing.
 
 
 79
 The FCC also held that the non-format questions raised by the Committee were not material and substantial, and thus that no hearing was required to resolve them. As to two such questions, we cannot agree.
 
 
 80
 1. Zenith's alleged losses.
 
 
 81
 Zenith claims to have incurred an operating loss of almost $2 million in the six years during which WEFM sold advertising time, and to have suffered a net after tax loss of approximately $1 million.[50] The Committee disputed this claim by alleging that Zenith continued to advertise its own products on WEFM, and did not really attempt to sell enough other advertising to make WEFM self-supporting. Neither the FCC nor Zenith referred to any evidence, nor does the record reveal any, either controverting the Committee's allegations or demonstrating that losses resulted despite the use of an accounting method that would give proper recognition to the institutional advertising and other promotional or developmental values derived by Zenith from WEFM.
 
 
 82
 The Committee did not itself base its disputation of the losses on Zenith's financial reports because, it says, the FCC considers such reports confidential and would not have given the Committee access to them had a request been made. In these circumstances, it is fundamentally unfair for the FCC to dismiss the Committee's challenge the Committee 'neither alleged any facts which would cast doubt on the reliability of the losses claimed by Zenith in the operation of WEFM nor has it seriously questioned those figures.' It did seriously question those losses in two respects, and the FCC should have used its authority under Section 309(e) to set the matters down for hearing and to assign the burden of proof respecting such losses and Zenith's claimed efforts to make WEFM self-sustaining after twenty-five years on non-commercial operation to the party with access to the relevant information, viz., Zenith.[51] Until these questions are resolved, there is simply no basis from which the FCC can infer that WEFM's classical music format is financially nonviable. See Progressive Rock, supra.
 
 
 83
 2. GCC's community leader survey.
 
 
 84
 In seeking reconsideration by the Commission, the Committee asserted that GCC had deliberately misled the FCC about its intentions to change WEFM's format. GCC represented that it approached the question of format with an open mind and then, on the basis of its community needs survey, determined to direct its programming to young adults, the group it considered most in need of service. Having made that decision, it first set out to determine how best to reach that audience and discovered that a rock music format would be the best vehicle for doing so. Thus, it did not inform community leaders interviewed at the outset of this process that it would change WEFM's format to rock music because it had not yet then determined whether to change the format at all.
 
 
 85
 There is a fact introduced by the Committee that casts some doubt on the bona fides of GCC's representation. The Committee, it will be recalled, inquired of and received answers from a number of the community leaders that GCC had surveyed about community needs and problems. Five of the twenty-four who answered the Committee's inquiry stated that they had been told that there would be a format change once GCC became the licensee of WEFM, and one recalled being told specifically that the new format would be rock music.
 
 
 86
 This situation is covered by what we said in Citizens Committee of Atlanta (436 F.2d at 271) where it was urged that discrepancies of exactly this sort
 
 
 87
 demonstrate actual misrepresentation on (the applicant's) part which disqualifies it from being a licensee. We are not disposed, at least on this record, to attribute such a purpose to (the applicant) . . .. Confusion, conflict, misunderstanding, obscurity-- all are inherent in a process in which the statements and opinions of one individual are sought to be determined from what two adversary parties say that he said or thinks . . ..
 
 
 88
 The truth is most likely to be refined and discovered in the crucible of an evidentiary hearing; and it is precisely a situation like the one revealed by this record which motivated Congress to stress the availability to the Commission of the hearing procedure.
 
 
 89
 A hearing is equally in order on the question of misrepresentation in this case.[52]
 
 III
 
 90
 This court's role as the sole forum for appeals from FCC licensing decisions impels us to add a further comment on the Commission's approach to the public interest in matters of format, and what it termed the 'ominous threat of a hearing.' As stated in Section I, supra, the six Commissioners who voted to deny reconsideration in this case spoke directly, through Chairman Burch, to the 'policy considerations underlying (their) decision.'[53] Their analysis contains an apparent error, and failure to identify it will only result in a continuation of this series of similar cases that began with Citizens Committee of Atlanta four years ago.
 
 
 91
 The crux of the Commissioners' reason for believing that entertainment 'program format is a matter best left to the discretion of the licensee or applicant' is that 'as a matter of public acceptance and economic necessity he will tend to program to meet the preferences of his area and fill whatever void is left by the programming of other stations.' But this analysis is not applied uniformly by the FCC, which distinguishes entertainment fare from other services, such as news and public affairs coverage, as to which the FCC 'require(s) that broadcasters conduct thorough surveys designed to assure familiarity with community problems and then develop programming responsive to those needs.' In this way, the FCC has attempted to strike a balance between free competition in broadcasting 'and the reasonable restriction of that freedom inherent in the public interest standard.' FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 474, 60 S.Ct. 693, 84 L.Ed. 869 (1940).
 
 
 92
 Precisely why the balance should be struck with entertainment programming in one pan and everything else in the other is not clear. The Policy Programming Statement pays a great deal of attention to First Amendment considerations in justifying the FCC's non-interference in entertainment matters, but familiar First Amendment concepts would, if anything, indicate a lessor-- not a greater-- governmental role in matters affecting news, public affairs, and religious programming. We need not today, however, wade into such deep waters.
 
 
 93
 The Supreme Court has, more recently than Sanders, made it clear that 'the 'public interest' to be served under the Communications Act is . . . the interest of the listening public in 'the larger and more effective use of radio.' 303(g).'
 
 
 94
 The Commission's licensing function cannot be discharged, therefore, merely by finding that there are no technological objections to the granting of a license. If the criterion of 'public interest' were limited to such matters, how could the Commission choose between two applicants for the same facilities, each of whom is financially and technically qualified to operate a station?
 
 
 95
 . . . .e b
 
 
 96
 The avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States.
 
 
 97
 National Broadcasting Co. v. United States, 319 U.S. 190, 216-217, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Moreover, there is no longer any room for doubt that, if the FCC is to pursue the public interest, it may not be able at the same time to pursue a policy of free competition.[54]
 
 
 98
 The very fact that Congress has seen fit to enter into the comprehensive regulation of communications embodied in the Federal Communications Act of 1934 contradicts the notion that national policy unqualifiedly favors competition in communications.
 
 
 99
 FCC v. RCA Communications, Inc., 346 U.S. 86, 93, 73 S.Ct. 998, 97 L.Ed. 1470 (1953).
 
 
 100
 This court does not sit to make radio policy, but to protect Congress's 'avowed aim' of 'secur(ing) the maximum benefits of radio to all the people of the United States.' What is a benefit, and of what magnitude, is a question ordinarily best left to the agency charged with regulating the industry in the public interest. But whether the diverse interests of all the people of the United States are being served by radio to the maximum extent possible is a question we cannot ignore in the context of a controversy like the one before us.
 
 
 101
 There is, in the familiar sense, no free market in radio entertainment because over-the-air broadcasters do not deal directly with their listeners. They derive their revenue from the sale of advertising time. More time may be sold, and at higher rates, by a station that has a larger or a demographically more desirable audience for advertisers. Broadcasters therefore find it to their interest to appeal, through their entertainment format, to the particular audience that will enable them to maximize advertising revenues. If advertisers on the whole prefer to reach an audience of a certain type, e.g., young adults with their larger discretionary incomes, then broadcasters, left entirely to themselves by the FCC, would shape their programming to the tastes of that segment of the public.
 
 
 102
 This is inherently inconsistent with 'secur(ing) the maximum benefits of radio to all the people of the United States,' and not a situation that we can square with the statute as construed by the Supreme Court. We think it axiomatic that preservation of a format would otherwise disappear, although economically and technologically viable and preferred by a significant number of listeners, is generally in the public interest.[55] There may well be situations in which that is not the case for reasons within the discretion of the FCC to consider, but a policy of mechanistic deference to 'competition' in entertainment program format will not focus the FCC's attention on the necessity to discern such reasons before allowing diversity, serving the public interest because it serves more of the public, to disappear from the airwaves.[56]
 
 
 103
 The orders under review are set aside, and the matter is remanded for further proceedings consistent herewith.
 
 
 104
 It is so ordered.
 
 
 105
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 
 ORDER
 
 106
 The Clerk is directed to file the lodged petition of intervenor GCC Communications of Chicago, Inc., for rehearing, and on consideration thereof, it is
 
 
 107
 Ordered by the Court en banc that the aforesaid petition for rehearing is denied.
 
 
 108
 Statement of BAZELON, Chief Judge, as to why he voted to deny rehearing:
 
 
 109
 Intervenor GCC Corporation asks the Court to reconsider Part II. C. 2 of its opinion which holds that on the present record there is a substantial question of fact whether GCC deliberately misled community leaders about its programming plans in its ascertainment survey. As I stated in my concurring opinion, I have some doubts about this holding but perceived no reason why further inquiry into this issue should be foreclosed since the case is to be remanded in any event. GCC in its petition for rehearing presents us with data which indicates that certain information upon which the Court relied in Part II. C. 2 may not be sufficiently valid to support a holding that a substantial question of fact exists on the ascertainment survey. This data should be presented to the FCC on remand of the case. Remand is dictated, as I have stated, on grounds independent of the ascertainment survey, and thus no purpose would be served by this Court taking the extraordinary step of considering evidence not in the administrative record. GCC suggests in its petition that the FCC is foreclosed by the Court's opinion from denying a hearing on the ascertainment survey issue after consideration of this new data. I do not so read the Court's opinion. If GCC puts its new data in affidavit form, it might properly persuade the Commission that no further evidentiary inquiry is needed. Nothing in Part II. C. 2 prevents the Commission from agreeing.
 
 
 110
 FAHY, Senior Circuit Judge (dissenting).
 
 
 111
 The question now is limited to whether the assignment should have been approved without a hearing. A hearing is required to resolve factual disputes which are substantial and material. 47 U.S.C. 309(e). There is no doubt that this provision applies when the Commission is to decide whether a format change such as here proposed would go into effect upon Commission approval of the assignment of the broadcasting license, a decision to be made under the standard of the public interest, convenience, and necessity. See, e.g., Lakewood Broadcasting Service v. F.C.C., 156 U.S.App.D.C. 9, 478 F.2d 919 (1973).
 
 
 112
 In approving the application for the assignment the Commission relied materially and substantially upon alleged financial losses suffered by Zenith, the assignor. I agree with Commissioner Johnson in his dissenting opinion that the attribution of such losses to Zenith's classical music format is a question which could not be answered without further investigation. The claim of losses was put in factual dispute by the Committee opposing the assignment, since Zenith continued to use the station to advertise its own manufactured products.
 
 
 113
 Since the court now affirms, I do not attempt an analysis of the further contention of the Committee that a hearing was required under the reasoning of this court's decision in the Atlanta case of Citizens Committee v. F.C.C., 141 U.S.App.D.C. 109, 436 F.2d 263 (1970), where the proposed abandonment of a classical music format was also involved. I add, however, that the limitation upon issues which require a hearing contained in the Keep Progressive Rock case[1] does not seem to me to accord with the approach of our court in the Atlanta case.
 
 ON REHEARING EN BANC
 
 114
 BAZELON, Chief Judge (concurring in the result):
 
 
 115
 As a member of the original panel in this case, I voted to sustain the Commission's action. At that time, I was concerned, as was the Commission to a limited extent,[1] with the First Amendment implication of FCC efforts to encourage diversity of programming. However, in light of quite recent panel decisions of this Court which have required the FCC in license assignment proceedings to consider reductions in diversity of entertainment programming caused by format changes, I deemed the occasion inopportune for a thorough ventilation of the First Amendment issues raised by consideration of diversity. I, therefore, voted to affirm the Commission's determination that diversity of programming was not seriously threatened by GCC's proposed format change and stated that 'at the present juncture and with the facts of this case, the current approach (of the FCC) of minimizing regulation except where diversity is most seriously threatened appears to be reasonably in accord with the goals of the Federal Communications Act and the First Amendment.'[2] However, I voted to grant the petition for rehearing en banc and now the Court holds that the Commission has not sufficiently considered the potential injury to diversity of programming caused by GCC's proposed format change. Pursuant to that holding the Court remands the case for further consideration of this issue and certain subsidiary factual issues. Issues of the weight to be given considerations of diversity and the types of proceedings in which it will be considered are inextricably bound up in the First Amendment values applicable to program regulation.[3] I, therefore, support the remand since it will necessarily require the FCC to more fully explore the First Amendment issues in the area of programming, the same issues which were the subject of my concern in the original panel opinion.[4]
 
 
 116
 In light of this rehearing en banc it is particularly appropriate to expand upon the First Amendment concerns which I briefly noted in the original panel opinion. For the present at least, this Court has exclusive jurisdiction over appeals from FCC licensing decisions.[5] Thus, our rulings on the scope of the Commission's authority in licensing proceedings are particularly important to the functioning of the Federal Communications Act. In this case, the Court sustains a broad view of the Commission's authority in the delicate area of programming with nary a syllable spoken to the First Amendment implications of its decision. I do not believe this broad view should go unchallenged.
 
 
 117
 The full breadth of the principle the Court enunciates today requires an extensive review of FCC programming policy and the First Amendment, a review which may take me beyond the specific issues presented by this case. Just as the Court views the authorization sustained in this case as rooted in basic principles of the Act, so 1 feel that the basic principles of the Act have developed with little or no consideration of the First Amendment. At oral argument of this case, when counsel expressed concern that the authority established here might constitute censorship, one of my colleagues correctly reminded him that the FCC reviews programming all the time. But my concern is that the whole gamut of FCC programming policies have developed over the last forty years, twenty-five of which I have sat in review of those policies, in a manner obdurately resistant to First Amendment values. I have in recent years grown increasingly disturbed by this situation and the accretion of my experience finally led me to a comprehensive consideration of the First Amendment and FCC programming policies.
 
 
 118
 For the convenience of the reader, I shall briefly outline the structure of this opinion. In Part I, I address the traditional schema of the First Amendment and the issue of what regulatory actions that schema enjoins upon the FCC. (Pp. 4-10) In Part II, I consider possible developments of First Amendment doctrine beyond this traditional schema in the area of telecommunications and two reasons which may support such a development. (Pp. 10-15) In Part III, I explore present FCC programming policies and suggest the extend to which those policies are justified by the development of First Amendment doctrine discussed in Part II. (Pp. 16-30) Finally, in Part IV, I consider the present case in light of the preceding discussion. (Pp. 30-32)
 
 I.
 
 119
 I shall begin with the role of antitrust analysis in telecommunications law. Although there was for a time some doubt about the proposition, it is now settled that the Commission may, indeed, must, consider diversification of ownership in the licensing of broadcast frequencies.[6] There are the normal competitive justifications for such a policy since, after all, telecommunications is a business, primarily an advertising business. One may perceive values of localism and promotion of small business in that policy as well. The FCC correspondingly has developed detailed common-ownership, duopoly, chain broadcasting and local control rules (and is considering cross-ownership rules) which properly guide in substantial part its licensing decisions.[7]
 
 
 120
 However, there is more than economic justification to this policy. I had occasion almost twenty years ago to state of the diversification guides:
 
 
 121
 These guides, like the First Amendment, rest 'on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public . . ..' Diversification, according to the Commission, 'protects the public from being placed in the position of having to depend upon a single or monopolistic source for its information about current affairs.'[8]
 
 
 122
 For conceptual purposes, diversification of ownership represents a policy supportive of unrestricted freedom of the press, in particular the encouragement of the widest possible range of journalistic and artistic[9] endeavor.
 
 
 123
 While the policy of diversification is supported by both antitrust considerations and these First Amendment considerations, one must not suppose that these two supports are complementary. A successful policy favoring competition for advertising dollars, as the Court suggests, may well result in, not creative journalism, but commercial pabulum directed toward those whose incomes are most often spent on the advertiser's wares.[10] A policy favoring quality journalism, on the other hand, may be anti-competitive since the broadcaster in pursuit of common notions of journalistic excellence may refuse to direct his programming at the optimal advertising audience. Journalism, like lawyering properly viewed, is not designed to 'sell' a 'product' but to apply rational intelligence to human experience.[11] It is by its nature anticompetitive in the economic sense.
 
 
 124
 There is thus no inevitable confluence between diversified ownership and quality journalism. Rather the proposition I spoke of in the Clarksburg case 20 years ago rests on an irreducible principle not subject to verification: to paraphrase Learned Hand, a multitude of tongues, completely unrestricted in speech, will somehow over the long run produce a multitude of ideas expressive of the culture and interest of all the people, such that national political debate and artistic achievement will flourish.[12] Our faith is that this system will produce more diversity of ideas than a system in which the government decides who shall speak and on what subjects. We thus would do well to remember that the concept of a multitude of tongues unrestricted in speech is the rule and the concept of a diversity of ideas is only a hoped-for goal.[13] This Court has recently been warned to proceed cautiously, if at all, away from the rule in pursuit of the goal.[14] I have previously indicated my agreement with that precept.[15] A healthy respect for the limits of human understanding in this complex area requires no less.
 
 
 125
 So, while it may be true that the licensee's 'business judgment', to use former Chairman Burch's term, is not necessarily or empirically supportive of the goal of a multitude of ideas, it is part and parcel of unrestricted freedom of the press. We would be confronted with serious First Amendment issues indeed if the Commission were ever to hold that otherwise protected[16] speech-- broadcast to maximize advertising revenues-- loses its First Amemdment protection, while protected speech-- broadcast to maximize the producer's sense of fulfillment or to maximize diversity of ideas-- remains under First Amendment protection.[17]
 
 
 126
 It would seem that diligent efforts to disperse ownership of the electronic media and disperse control over programming would adequately protect First Amendment interests. However, for various reasons including the lack of diligence of the FCC and the nature of the electronic communications industry, concentration of ownership remains a serious problem.[18] Furthermore, the rise of network programming has largely centralized programming decisions despite some FCC efforts to encourage licensees to take a greater degree of responsibility for what is telecast over their facilities.[19] Finally, the FCC's inability to forestall trafficking in broadcast licenses[20] has meant that diversification of ownership is at times an empty gesture resulting only in inordinate profits to private licensees and no increase in the variety of programming. In turn, the huge price paid for a license is borne by the viewer in the form of excessive commercial time and mass appeal programming, further reducing the potential of the individual licensee as an innovative and diverse speaker. The experience of the diversification guides thus suggests the concept of expanding the multitude of tongues to vindicate First Amendment values is more dream than reality. This is, of course, not an argument against further attempts to increase diversity of ownership but rather only a recognition that the traditional schema of the First Amendment may be inadequate in the field of telecommunications.
 
 II.
 
 127
 I have said that the Commission can and should attempt through the licensing process to ensure a multitude of tongues in order to provide the people with a multitude of ideas. This authorization is founded on values contained in the First Amendment and is thus presumed to be part of the FCC's 'public interest' standard.[21] If these First Amendment values are allowed to venture beyond the strict rule of a multitude of tongues unrestricted in speech, to include protection for direct actions designed to increase diversity of ideas, the door would be opened to a more expansive view of the public interest standard. This expansive view, also founded on the First Amendment, could include an authorization to directly increase diversity of ideas and programming through means other than increases in the number of speakers. The Supreme Court in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 385, 390, 394, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) gave a limited approval to such a view of the public interest standard.[22]
 
 
 128
 If Red Lion holds that First Amendment values authorize FCC actions designed to directly increase diversity of ideas, then Red Lion might in the appropriate case permit judicial intervention to require the FCC to promote diversity of ideas through means other than increases in the number of speakers. This is consonant with the structure of the Act since the FCC has no special expertise in the First Amendment. This Court, in requiring the FCC to promote diversity through denial of license assignments which substantially affect over-all diversity of programming, bases its action on the statutory goal of 'secur(ing) the maximum benefits of radio to all the people . . ..'[23] Since radio is neither a public utility nor a common carrier,[24] and this presumed statutory goal must be reconciled with 326 of the Act[25] and the First Amendment itself, I assume the import of this goal relates also to the First Amendment goal of a diversity of ideas.[26] The question to be faced ultimately is thus whether this Court should move away from the rule of a multitude of tongues unrestricted in speech in pursuit of the goal of a true diversity of ideas.
 
 
 129
 I first digress to consider what reasons might justify this movement away from our traditional notions of the First Amendment. The most obvious reason is that there are in terms of present technology[27] limits on the FCC's ability to increase the multitude of tongues. These limits are primarily associated with the scarcity of broadcast frequencies and the expense involved in the erection of facilities necessary to exploit that frequency. See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 388-390, 396-400, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). These limits are not simple products of a free economy; they are mandated by law.[28] These limits are not themselves violations of the First Amendment. They were and are necessary, or so we continue to assume absent evidence to the contrary, in order to prevent total anarchy in the broadcast media.[29] Since the principle that a multitude of voices will produce a multitude of ideas is at bottom premised on free entry into the media of communication, that principle must be re-examined to insure that the process of limitation of entry does not itself deny the First Amendment rights of those who might otherwise speak through the scarce media. This re-examination is made all the more necessary by the checkered history of FCC commitment to encouraging the maximum number of speakers and its acquiescence in anti-competitive practices and trafficking in broadcast licenses.[30]
 
 
 130
 One might note another area in which an unrestricted adherence to a multiplicity of voices alone may cut against constitutional values. I have previously noted the 'involuntary' nature of some television and radio listening.[31] To this involuntary aspect of telecommunications I have also added the observation that radio and especially television is a particularly forceful mode of communication which has by its nature some qualities of 'action' or 'speech plus.' In short, the immediacy and all-pervasive nature of telecommunications present a form of speech unknown to the framers of the Constitution.[32]
 
 
 131
 The combination of limited access and the particular nature of radio and television communications now poses the question whether in practice our complete reliance on a multitude of voices to promote First Amendment values is justified. I am beginning to have some trouble with Mr. Justice Douglas' view that this reliance is justified.[33] I hasten to note that I would not 'balance' First Amendment values against other values of public order; rather I would seek only to reconcile the First Amendment within itself and within the context of other constitutional values. I do this with the full knowledge that any such reconciliation may involve inquiry into the content of speech, indeed, picking and choosing among speakers on the basis of the content of their speech. This process of choice, once begun, may well be difficult to halt short of disaster. At least the thought of future horribles ought not shut off confrontation with present failures.[34] I believe that pretending there is no problem may be more disasterous in the long run than judicious consideration of appropriate and limited solutions. I proceed to a discussion of possible efforts to locate and address failures in the promotion of First Amendment values within the present system of telecommunication regulation.
 
 III.
 
 132
 The first project for consideration if we wish to regulate programming to achieve diversity is to establish what sort of failures of diversity will give rise to the need for regulation. Once having established that or having confronted a reasonable probability that left to their own devices the limited number of licensees will not produce a true multiplicity of ideas, there are two possible paths to explore. First, we might establish duties of inquiry on the licensee which, if exercised, will cause the collection of information potentially productive of diversity. Second, we can control, deter or punish certain failures to produce diversity. These two approaches are double-edged, in that they both define an absence of diversity and remedy that absence.
 
 
 133
 The FCC has in fact implemented the first approach by requiring licensees or applicants to survey the community they wish to serve to develop information on tastes and interests within the community. This is the so-called 'ascertainment' requirement.[35] The Commission has also required the licensee to take reasonable measures to insure the accuracy of information it broadcasts on controversial[36] issues of public importance so that the licensee does not present slanted or distorted public affairs programming[37] or defame innocent individuals.[38] These duties are part of the 'fairness doctrine.'[39] Related to such duties is the general duty to operate a frequency as a journalistic or artistic endeavor and not as a broadcast supermarket.[40] None of these duties on their face raise First Amendment issues since they do not directly regulate protected speech. Rather these duties merely establish conditions applicable to certain activities of a broadcaster prior to the formulation of protected programming.[41]
 
 
 134
 The FCC has also implemented to some extent the second approach discussed above and has in the process created grave First Amendment issues. First and foremost, in regard to the fairness doctrine, the Commission has not only placed duties of accuracy on the licensee but has also required the licensee to present 'both sides' of controversial issues of public importance. This duty is applicable even if the broadcaster's reasoned judgment is that the 'other side' has no merit.[42] Furthermore, the Commission has considered fairness doctrine complaints issue by issue and where it has found violations, it has strongly intimated that certain opposing views must be aired.[43] The Commission has also required licensees to grant specific reply time to subjects of personal attack and to the opposing side of a political editorial, as well as grant equal time to candidates for public office.[44] In license renewal proceedings, the Commission has formulated its own concept of 'balanced programming', a concept reflected in programming 'guidelines' which, if followed by the licensee offer substantial protection from hearings on applications for renewal.[45] And pursuant to our mandate in Citizens Committee of Atlanta v. FCC,[46] the FCC has to some extent considered directly the impact on program diversity of radio format changes in assignment and renewal hearings. In that consideration the Commission has the authority to deny an assignment or renewal request because proposed programming, proposed speech if you will, reduces the diversity of programming in the service area. Finally, as discussed below, the Commission has chosen among applicants in comparative proceedings on the basis of programming proposals. Either a requirement to air that which the journalist does not wish to air,[47] or a denial of a forum (a license) on the basis of the content of proposed or past speech[48] would in any context other than mass communications be an uncontestable denial of freedom of the press. Are the differences between the broadcast media and the print media such as to permit this distinction?
 
 
 135
 I think it instructive at this point to distinguish between, on the one hand, petitions to deny[49] or petitions to require compliance with specific aspects of the fairness doctrine,[50] and, on the other hand, comparative licensing proceedings.[51] In the former, I can perceive no rationale for anything a) approaching a requirement that the licensee air certain political views or artistic achievement or b) approaching a possible denial of a license on that basis. Such requirements would in any other context directly contravene freedom of the press and cannot be justified by the nature of telecommunications. Even assuming that scarcity of broadcast frequencies is a reality today or will continue to be a reality in the future,[52] scarcity cannot justify intrusions into programming decisions in a non-comparative situation since its factual predicate-- competing applications-- is lacking. The general intrusive nature of telecommunications itself cannot without more justify these deprivations of freedom of the press.[53]
 
 
 136
 Despite the seemingly persuasive force of this argument, it must give way to the holding in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). That case upheld the personal attack and editorial reply aspects of the 'fairness doctrine' as consistent with the First Amendment. How far beyond this the case carries is a matter of serious doubt after the Democratic National Committee case[54] and the Miami Herald case.[55] In the latter case, the Supreme Court, without citing or distinguishing Red Lion, held that a right of reply to a political editorial in a newspaper was a denial of the freedom of the press. I would read Red Lion as strictly limited to the personal attack and editorial reply rules.[56]
 
 
 137
 The comparative licensing proceeding strikes me as a generically different situation. Here the scarcity rationale is appropriate.[57] When faced with mutually exclusive applicants[58] for the same frequency the FCC is in a position where it must by the nature of the proceeding choose among speakers. It might be objected that the FCC could choose among speakers on the basis of criteria other than the content of their speech. Such a proposition ignores the realities of the choice. To allocate frequencies on the basis of allegedly 'content-neutral' standards such as financial stability, past experience or diversification effect may well have profound effects on the content of speech through the establishment of a class of preferred speakers. One suspects that there is no such thing as a 'content neutral' standard. Furthermore, it is difficult to perceive how the important choice among applicants can be made on the basis of these factors alone when the raison d'etre of the grant of a license is the nature of the programming.[59] To attempt to make the license choice on the basis of content-neutral factors, if any exist, is analogous to choosing a relief pitcher on the basis of his criminal record and off-season earnings.
 
 
 138
 This Court and the FCC have consistently reviewed program proposals in ruling on mutually exclusive broadcast applications.[60] While it is generally stated that the Commission will not consider differences in programming proposals unless such differences are significant and are specifically designated as a comparative issue, the reports are filled with instances, at least prior to 1965,[61] in which differences in program figured significantly in the comparative process.[62] Of particular relevance to the situation we confront in this case are a series of Commission decisions, including some after 1965, which accord comparative weight to program proposals designed to meet a special, unfulfilled community need.[63] This consideration of program proposals is significantly distinct, or so it appears from the reported cases, from the consideration given to program proposals in uncontested initial licensing or renewal proceedings.[64] To be sure, we have emphasized that the Commission cannot choose on the basis of 'political, economic or social views of an applicant.'[65] However, where the Commission seeks only to encourage licensees or applicants to meet community needs which at present are not being fulfilled we have permitted and even approved such efforts as consistent with the First Amendment.[66] I also note that this consideration of program content in comparative proceedings is calculated to promote economic and journalistic competition among licensees by raising the spector of potential competition.[67]
 
 
 139
 It would seem that authorizing this kind of limited and specific consideration of content does not threaten the licensee with censorship. It would only adduce one factor which must be considered in the difficult and sensitive task of allocating a scarce resource in a manner consistent with the First Amendment value of a diversity of ideas.[68] In any event, I do not believe that this precedent can support consideration of content in a non-comparative proceeding; nor do I believe it can support any 'guidelines' which insulate a licensee from a contested renewal hearing. This precedent also does not support any FCC directives requiring the licensee, de facto, to air certain material. Finally, and most important, this precedent is not self-executing. Difficult questions remain as to the specific application of the principle developed above and the manner of its enforcement, questions which must be considered in light of the delicate accommodation of First Amendment values discussed in Part II above. In particular, the extent to which the FCC doctrines, such as the Fairness Doctrine, designed to deter certain failures to produce diversity may be considered in a comparative hearing is not settled in my mind.
 
 
 140
 I do not wish to leave the impression from this discussion that I approve the present conduct of comparative hearings either on proposed programming issues or on other issues. Indeed, my view is that the comparative hearing process in the FCC is at present seriously flawed due to a lack of standards. Furthermore, I don't mean to argue that proposed programming should always be considered in comparative hearings. Rather, I am only stating that if we find sufficient failure in the traditional schema of the First Amendment to justify direct regulation designed to achieve greater diversity, then the proper arena for that regulation is the comparative hearing, as flawed and arbitrary as it is at present. In a perfect world we would have no cause to ever inquire into programming.
 
 
 141
 In the preceding paragraphs I have attempted a reconciliation of the existing system of telecommunication regulation and the developing schema of the First Amendment. I don't want to leave the impression that this attempt leaves me entirely satisfied; far from that, the more I study the relation of these two areas the more uncertain and troubled I become. Particularly intractible to my mind is the relation of modern notions of 'chilling effect' or 'breathing space' for First Amendment freedoms and a comprehensive system of governmental licensing of speakers. Indeed, a plausible argument can be made that the entire Federal Communications Act could not survive the test of Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).[69] Not only has that argument never received even the beginnings of legal respectability, but it has not even led courts to strictly construe the authority delegated to the Commission or to otherwise narrow and define the limits of its power. Quite the contrary, with the exception of our opinion in Banzhaf courts have affirmed Commission authority in this delicate area in the most sweeping terms, as if it were no more limited than an ordinary exercise of the police power. As First Amendment jurisprudence developed rapidly in the last two decades, venerable FCC policies remained in a stagnant backwash, a permanent 'derelict in the stream of the law.'[70]
 
 
 142
 I am led to the conclusion that the notion of 'chilling effect' must be substantially revised if First Amendment jurisprudence is to permit direct action to increase diversity of ideas. Instead of being an absolute bar to governmental licensing of speakers, perhaps the 'chilling effect' doctrine should be the basis for intensive judicial oversight of FCC enforcement of policies designed to increase diversity.[71] The possibility that licensees will be 'chilled' by the very existence of a system of licensing might be put to one side hopefully in service of important efforts to directly achieve diversity.[72] This conclusion is disturbing and even non-symetrical in terms of First Amendment doctrine as a whole, but I am not yet aware of any other possible reconciliation.
 
 
 143
 The life of the law in this area is thus surely not logic. I would be less concerned if I were sure it was experience; however, surveying the field after twenty-five years of work, I have serious doubts that the experience of non-regulation or the history of regulation really were the cause of all this startling, even radical, departure from our traditions. Mostly, we are today reasoning backward, developing post hoc rationalizations which both reaffirm, and hopefully limit, the intrusion on First Amendment values. My review of this area raises some very fundamental questions about our true commitment to the system of freedom of expression. The fragility of even such basic traditions as free speech is always most evident when we are asked to 'extend' it to a heretofore unknown situation which is actually indistinguishable from the present context of the tradition. For example, it took us until 1967 to discover that wiretapping was a 'search'[73] and even today we are told that government compelled record-keeping of transactions between banks and the citizenry is not a 'search.'[74] We grip tightly to the empty form of an ideal while the substance has long ago escaped in disguise. I have more times than I wish to remember protested against this kind of mythology in the area of criminal procedure.[75]
 
 
 144
 Having said all this does not mean I am ready to sweep away forty years of telecommunication regulation. The egg is too thoroughly scrambled for judicial unscrambling. Ultimate redress must rest with the Congress, the institution in our society which may legitimately transform telecommunications regulation to the degree necessary to truly accommodate First Amendment values. Congress would have several options-- from altering the system of licenses from private licensees to public common carriers to complete and retroactive enforcement of the diversification guides. We must rely on Congress' willingness to do more than entrench the economic interests of the existing licensees. Meanwhile, we have no recourse but a case by case attempt at reconciliation, no matter how unbalanced and illogical each particular attempt may seem. This is a process which makes skeptics of us all.
 
 IV.
 
 145
 I turn now to the present case where petitioners seek to prevent Zenith from assigning its license to GCC. Because of 310(b), a very unwise statute in my view, a license assignment is a unique proceeding since the Commission is prohibited by that section from considering other applicants for the frequency under review. It thus would seem that this license assignment is a non-comparative proceeding and, pursuant to the views expressed in Part III above, the petition to deny should be denied without a hearing since the FCC has no authorization to consider program content in a non-comparative hearing. However, our decision in Citizens Committee of Atlanta suggests, and I follow it in this case, that a license assignment is comparative in that the assignee and the assignor are compared.[76] The predicate for this holding is a finding that if the license assignment is denied, Zenith will continue to operate the station and will not be permitted to cease broadcasting. The record on that point is simply non-existent. I, therefore, would require the FCC, prior to consideration of the diversity issue, to determine whether Zenith may realistically be viewed as a comparative applicant. Such a determination is, I think, relatively co-terminus with the factual issue set out in Part II, C, 1 of the Court's opinion. If Zenith may be considered a comparative applicant, I would expect the FCC to apply its established precedent[77] granting a preference to an applicant that proposes programming which meets an unfulfilled need in the community. Of course, the scope of that precedent is far from obvious and, indeed, its permissable scope in relation to First Amendment concerns is not settled. I would leave the initial determination of these questions to the FCC and reserve final judgment until it has spoken. In passing, I should note one potentially anomalous consequence of denying the application for assignment is that Zenith might itself without assignment change its format. That change would most likely go unreviewed by the FCC. However, absent convincing evidence that this will occur (a question linked in no small part to the issue of whether Zenith can be considered a comparative applicant), I would assume that Zenith will abide by its representations to the FCC concerning programming made at its most recent renewal proceeding.
 
 
 146
 If Zenith is not to be considered a comparative applicant, I believe that the FCC has no authority to inquire into the diversity issue. Its sole inquiry in a non-comparative proceeding, once having disposed of non-content issues such as financial, technical, character and diversification of ownership considerations, is to determine the licensee's good faith in ascertaining the needs of the community and presenting accurate public affairs programming.[78] I should note that this good faith obligation does not to my mind require the licensee to propose any particular 'balanced' format or require him to present general rather than specialized entertainment programming.[79] The Court in Part II, C, 2 holds that there is a substantial question of fact as to whether GCC did make a good faith effort to ascertain community needs. While I would be less certain about the proposition as an original matter, since the case is to be remanded on the general diversity issue, I see no reason to restrict inquiry into this issue of good faith ascertainment of community needs.
 
 
 147
 On this basis I concur in the Court's mandate.
 
 ROBB, Circuit Judge, (dissenting):
 
 148
 As a member of the original panel in this case I concurred in the views cogently expressed by Chief Judge Bazelon in Part II of his opinion for the panel. I adhere to those views. Since Chief Judge Bazelon's opinion has been vacated I here reproduce Part II, after renumbering the footnotes.
 
 
 149
 In recent years this Court and the FCC have begun to develop principles governing government control of format changes.[1] This Court has held that the public has an interest in the diversity of entertainment formats.[2] Consequently the Commission has had to consider format changes in its statutory determination that a proposed assignment of a license comports with 'the public interest, convenience, and necessity.'[3] Factual disputes surrounding the format change are material and if substantial become subject to the statutory requirement that a hearing be held.[4]
 
 
 150
 In this case appellants contend that substantial factual disputes exist on two issues relating to the proposed format change-- the diversity of available formats and Zenith's alleged financial losses.
 
 
 151
 As to diversity, appellants maintain that a substantial issue of fact exists as to whether the Chicago public demands and needs the continuation of classical music on WEFM as opposed to 'yet another contemporary music station.'[5] Appellants point to the numerous letters and petitions of protest which greeted the news that WEFM was about to abandon its classical format. They note that Chicago has numerous rock stations already, while the demise of WEFM will leave only one classical music station with the power to reach the entire Chicago area.
 
 
 152
 Our previous opinions and the Commission's actions indicate that the majority of format changes are left to the give and take of the market environment and the business judgment of the licensee.[6] It is only when the format to be discontinued is apparently unique to the area served that a hearing on the public interest must be held.[7] In such cases the public interest in diversity may outweigh the dangers of government intrusion into the content of programming.
 
 
 153
 In this case it is undisputed that the entire area served by WEFM is served by another classical music station, WFMT-FM.[8] Thus we are unable to find a substantial issue of fact requiring a hearing on the diversity point.[9]
 
 
 154
 Appellants also contend that a substantial issue of fact exists concerning the losses Zenith alleges it sustained during its operation of WEFM. Even assuming that such an issue would require a hearing in the absence of a substantial diversity issue, we do not find that appellants have raised a substantial issue of fact here. The Commission had sufficient evidence to support its finding that WEFM had incurred substantial losses in the period after 1965, when the station was operated on a commercial basis and not as a research and development adjunct to the Zenith corporation.[10]
 
 MacKINNON, Circuit Judge, (dissenting):
 
 155
 The majority opinion indicates that we are beginning to open the door wider for intrusion of the courts and the Government into the content of radio broadcasts. To my mind such governmental interference should be held to a minimum and the power should not be exercised except upon the clearest grounds. I fail to see that such grounds exist when we are forced to draw a distinction based on differences in 'classical' music to sustain jurisdiction to interfere. Generally my view of the facts and the law is expressed in Judge Robb's dissent with which I concur.
 
 
 
 [1]
 Memorandum Opinion and Order, FCC 72-1129, adopted December 13, 1972 and released December 21, 1972, 38 FCC2d 838 (1972). This order also dismissed a Complaint filed by appellants. The Complaint had requested that the FCC dedicate WEFM's channel to a classical and related cultural music format for so long as the listening audience remained interested in such programming and a qualified person or group was willing to continue such a format
 
 
 [2]
 See Citizens Committee to Preserve the Voice of the Arts in Atlanta v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970); Hartford Communications Committee v. FCC, 151 U.S.App.D.C. 354, 467 F.2d 408 (1972); Lakewood Broadcasting Service, Inc. v. FCC, 156 U.S.App.D.C. 9, 478 F.2d 919 (1973); The Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.App.D.C. 16, 478 F.2d 926 (1973)
 
 
 [3]
 The Citizens Committee to Keep Progressive Rock, at 16, 478 F.2d 926
 
 
 [4]
 Lakewood Broadcasting Service, Inc., at 12 of 156 U.S.App.D.C. at 922 of 478 F.2d
 
 
 [5]
 Id
 
 
 [6]
 Appellants' brief, at 38
 
 
 [7]
 The Citizens Committee to Keep Progressive Rock, at 16 of 156 U.S.App.D.C., 478 F.2d 926
 
 
 [8]
 Id. at 16, 478 F.2d 926
 
 
 [9]
 A third classical music station, WNIB-FM, currently serves a smaller part of the Chicago area. GCC has agreed that if their license application is approved, they will relinquish the call letters WEFM to WNIB and give WNIB the WEFM classical music library as well as technical assistance designed to enable WNIB to increase its power
 
 
 [10]
 The long history of WEFM's service does not diminish the impact of WFMT's similar programming. The length of time that a format has been on the air is usually relevant only when that format is unique. See Citizens Committee to Keep Progressive Rock, at 24, 478 F.2d at 934, note 22:
 Naturally the length of time that a specific format has been on the air is a factor to be considered in the ultimate public interest determination, for it can have a direct bearing on the degree of attachment which the public has to the unique format.
 This approach to the diversity issue cannot be applied in a mechanistic fashion. Whether a format to be discontinued is unique can be a subtle question requiring that more than mere labels be examined. The fact, for example, that two stations are labelled 'classical' does not automatically mean that they provide substantially similar programming. One of the stations might never play music composed in this century, while the other devotes considerable amounts of time to such music. In this case, however, it is apparent that WEFM and WFMT have substantially similar programming, both covering a broad range of classical music. Cf. Citizens Committee to Keep Progressive Rock, at 16, 478 F.2d 926, where this Court noted that 'Top 40' stations cannot automatically be assumed to provide substantial amounts of 'progressive rock' music.
 
 
 [11]
 Zenith was not, for example, able to obtain enough advertising to fill the two and one-half minutes per hour it allotted for ads. Joint Appendix at 73
 Appellants' contention concerning the adequacy of the notice of the application for voluntary transfer is also without merit. The Commission properly found that Zenith complied with the notice requirements of the Commission's rules. The notice given was not constitutionally defective.
 Similarly, appellants' contention that the Commission's ex parte rules had an unconstitutional impact on the public discussion of the format change is without merit in the setting of this case.
 
 
 [12]
 See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16 (1972) (Bazelon, C.J., dissenting)
 
 
 [13]
 See Yale Broadcasting Company v. FCC, On Motion for Rehearing En Banc, 155 U.S.App.D.C. 390, 478 F.2d 594 (statement of Bazelon, C.J.)
 
 
 [14]
 See, e.g., Jacobellis v. Ohio, 378 U.S. 184, 191, 84 S.Ct. 1676, 1680, 12 L.Ed.2d 793 (1964) (Brennan, J.) ('It follows that material dealing with sex in a manner that advocates ideas, . . . or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection (of the First Amendment).')
 See, also, Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). ('The importance of (freedom of the press) consists, besides the advancements of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government . . .').
 Zechariah Chafee, Jr. set forth the historical argument that the First Amendment was designed to include the arts within its protection:
 No doubt, the Zenger trial and the controversy over Wilkes and Junius in England did associate the struggle for freedom of speech to some extent with popular discussion of political questions, but the struggle was also related to the abolition of the censorship of books of any sort. Milton's Areopagitica advocated freedom of much else besides political tracts. The First Amendment brackets freedom of speech with freedom of the press . . . If 'speech' is limited . . . so is 'press.' Yet that is impossible in view of the address of the Continental Congress in 1774 to the people of Quebec, in which freedom of the press, in addition to its political values, is said to be important for 'the advancement of truth, science, morality and arts in general.' . . .
 Moreover, the framers would hardly have relegated science, art, drama, and poetry to the obscure shelter of the Fifth Amendment, . . . inasmuch as 'due process' meant mainly proper procedure until the middle of the nineteenth century . . .. Chafee, Book Review, 62 Harv.L.Rev. 891, 896 (1947).
 
 
 [15]
 See Yale Broadcasting Company v. FCC, On Motion for Rehearing En Banc, at 397 of 155 U.S.App.D.C., at 594 of 478 F.2d, note 23, and sources cited therein. See, also, Morison, Oxford History of the American People, 292, 472, 912, 913 (1965) for comments on the role of classical music in American culture
 
 
 [16]
 See, generally, Yale Broadcasting Co., On Motion for Rehearing En Banc
 
 
 [17]
 Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945)
 
 
 [18]
 See Brandywine-Main Line Radio, Inc. (Bazelon, C.J., dissenting), at 319-320 of 153 U.S.App.D.C., 473 F.2d 16
 
 
 [19]
 Id
 
 
 [20]
 See, e.g., Memorandum Opinion and Order, FCC 73-329, adopted March 21, 1973 and released March 22, 1973, 40 FCC 223 (1973), additional views of Chairman Burch
 
 
 [21]
 Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 594 (1971)
 
 
 [22]
 47 U.S.C. 310(b) provides as follows:
 No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby. Any such application shall be disposed of as if the proposed transferee or assignee were making application under section 308 of this title for the permit or license in question; but in acting thereon the Commission may not consider whether the public interest, convenience, and necessity might be served by the transfer, assignment, or disposal of the permit or license to a person other than the proposed transferee or assignee.
 
 
 [23]
 Statement of Assignor's Purpose in Requesting Assignment of the License of WEFM, J.A. 240
 
 
 [24]
 GCC is a subsidiary of General Cinema Corporation, which controls several stations in other cities
 
 
 [25]
 As explained in GCC's later opposition to the petition to deny, 'contemporary' music is rock music. J.A. 91. According to GCC's own account (J.A. 343), however, five of the sixty-one stations serving the Chicago area play rock, progressive rock, or jazz rock music, while another eight concentrate on 'pop,' or 'pop contemporary' music. Ascertainment of Community Interests, Needs and Problems 70-73, J.A. 253-56
 
 
 [26]
 Part of the area is also served by WNIB. GCC has proposed to give the classical music library acquired from WEFM, along with technical assistance and that station's call letters, to WNIB. WNIB would then, so it is said, be able to reach a larger portion of WEFM's service area with classical music
 
 
 [27]
 In its petition for rehearing in this court, the Committee refers to a study introduced as Exhibit 1A but not part of the administrative record, see note 12, infra, said to document 'the degree to which WEFM has its own identity and audience loyalty' and makes unique contributions to diversity 'significantly different from and in addition to those of WFMT.'
 
 
 [28]
 Alexander Tanger, who organized GCC, purchased all 500 of its common shares at $1.00 per share. The company then got an unsecured loan of $1,250,000 from General Cinema, of which $1,000,000 was to be used to purchase WEFM. General Cinema purchased GCC's preferred stock for $50,000
 
 
 [29]
 The Committee did allege that 'WEFM is not operated by a separate corporation. Petitioners have not been apprised of, nor have they had the opportunity to examine, Zenith's records to determine the method under which Zenith allocates expenses and revenues or includes in Zenith's income revenues attributable to the use of Station WEFM by Zenith for advertising its products.'
 
 
 [30]
 The Opinion issued for four Commissioners; a fifth joined in the result, one did not participate, and one (Johnson) dissented in a separate opinion
 
 
 [31]
 In support of this position, the FCC quoted from and relied on its then recent decision in Twin States Broadcasting, 35 FCC2d 969 (1972), which we later reversed and remanded for a hearing under the doctrine of Citizens Committee of Atlanta. Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.App.D.C. 16, 478 F.2d 926 (1973)
 
 
 [32]
 The Commission was also of the view that 'no substantial question exists regarding the WEFM operational losses,' but was quick to add that the existence vel non of such a question was not critical to its decision inasmuch as financial viability was not a material consideration outside of the unique format context. 38 FCC2d at 845 & n. 12
 The FCC rejected the Committee's attack on the adequacy of the public notice required to be given under its rules. With respect to the Committee's November 20 complaint requesting that station WEFM be dedicated to classical music as long as a qualified licensee could be found to operate it, the FCC relied on Section 310(b) of the Communications Act, 47 U.S.C. 310(b), which prohibits it from considering whether the public interest might be served by assignment of a license to any person other than the proposed transferee before it, and reiterated its view that 'the choice of a particular musical format is primarily a business judgment which a licensee or applicant must make in determining whether he can successfully operate the station and render service to his community of license.' 38 FCC2d at 848. Accordingly, it held that a hearing on the complaint was not warranted.
 
 
 [33]
 The Committee offered to present at a hearing a study then in progress of the value of WEFM's programming in order to assist the FCC in weighing the public interest. See D. Bogue, The Radio Audience for Classical Music: The Case of WEFM, Chicago (Communication Laboratory, Community and Family Study Center, The University of Chicago, 1973)
 
 
 [34]
 The dispute over WNIB's suitability as a substitute reflects a difference in premises as to the relevant service area. The FCC considered service to the city of license of primary importance, thereby mooting the relevance of the Committee's contention that WNIB serves at most 20% Of WEFM's listener area, which has a radius from Chicago of about 100 miles. See Section II. B. 1, infra
 
 
 [35]
 The Committee also challenges on First Amendment grounds Zenith's refusal, sanctioned by the FCC's interpretation of its own regulations, to grant the Committee's request that the question of Zenith's format change be discussed on WEFM. Our disposition of the case makes it unnecessary to reach this point, but, as the Committee notes, it is closely related to the notice problem and could likewise be usefully reconsidered by the FCC in this or another case. See note 34, infra. Neither do we reach the Committee's claim that the FCC failed to make a public interest finding in haec verba, as required in Joseph v. FCC, 131 U.S.App.D.C. 207, 404 F.2d 207 (1968), where the FCC acted without issuing the kind of opinion from which it could fairly be inferred that it had 'taken a 'hard look' at the salient problems.' Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971)
 
 
 [36]
 Assignment applications are subject to the same standards and treated in the same manner as initial license applications unless they do not entail a substantial change in ownership or control. 47 U.S.C. 308, 309(a); see id. 309(c)(2)(B)
 
 
 [37]
 The FCC's failure to designate an unopposed application for a hearing sua sponte would not, of course, be reviewed, since there would be no party in interest to seek review
 
 
 [38]
 As Judge Tamm has said, 'We suspect, not altogether facetiously, that the Commission would be more than willing to limit the precedential effect of Citizens Committee (of Atlanta) to cases involving Atlanta classical music stations.' Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.App.D.C. 16, 478 F.2d 926, 930 (1973)
 
 
 [39]
 Accord, Hartford Communications Committee v. FCC, 151 U.S.App.D.C. 354, 467 F.2d 408 (1972) ('format' cases distinguished on basis of FCC's inference that a proposed change involving greater emphasis on religious programming in an expanded overall schedule that did not reduce service of other types did not constitute a format change)
 
 
 [40]
 For a full explication of the substantiality criterion, see Stone v. FCC, 151 U.S.App.D.C. 145, 466 F.2d 316, 321-323 (1972)
 
 
 [41]
 Mere inspection of the map indicates that either this statement or the map is not entirely accurate. See 40 FCC 2d at 228
 
 
 [42]
 The FCC's mandate to approve applications consistent with the public interest, and only such applications, is not dependent upon the assiduousness of intervenors such as the Committee. An agency charged with regulation in the public interest cannot abdicate its responsibility, preferring for itself the role of an umpire between the regulated industry and public protestants. Office of Communication, United Church of Christ v. FCC, 138 U.S.App.D.C. 112, 425 F.2d 543 (1969) (Burger, J.); see Greene County Planning Bd. v. FPC, 455 F.2d 412 (2d Cir. 1972). Even in the absence of intervention, the FCC is obliged to be certain it is not dealing with a format charge affected with the public interest by reason of the uniqueness of the format to be abandoned. Public silence, after adequate public notice, would provide such assurance, just as 'public grumbling (of) significant proportions,' Progressive Rock, supra, raises the question
 
 
 [43]
 The Committee variously puts WNIB's service area at 15% Or 'ar best' 20% Of that of WEFM, but it is not clear whether these percentages represent potential audience figures or geographical area, or whether they take account of anticipated improvements. GCC's opposition to petition for reconsideration refers to an attached 'engineering affidavit' (not in the Joint Appendix) indicating that WNIB serves all of the city of Chicago and 41% Of the total area served by WEFM, and predicting that it could be improved to serve 'an area almost comparable in size to that of WEFM.' J.A. 191. On the view that the FCC took of the matter, the horizons of which were drawn at the boundaries of the city of Chicago, these differences were not in need of resolution
 
 
 [44]
 Areas that receive a distant station under unusual or occasional circumstances or because of fortuitous physical phenomena are not contemplated by this discussion, which relates directly to the problem of metropolitan areas that encompass a major city to which stations are typically licensed
 
 
 [45]
 We note that GCC's Ascertainment of Community Interests, Needs and Problems, which the FCC accepted as adequate, takes as the relevant 'community' an area said to be coextensive with 'the essential broadcast coverage area of WEFM and, hence, it is the area which WEFM serves.' J.A. 369. This area encompasses six counties in Illinois and four in Indiana. Its Community Leader Survey encompassed 'the Chicago Metropolitan Area,' with the exception of cities within a 75-mile radius of Chicago that are themselves cities of license for a radio station (such as Milwaukee, Wisconsin; Rockford, Illinois; and Gary, Indiana). Its 'Study of Desired Radio Programming and Desired Music in Chicago and the Chicago Metropolitan Area,' also said to be approximately coextensive with the area reached by WEFM's signal, is based on the musical preferences of persons in six Illinois and four Indiana counties
 
 
 [46]
 GCC's own preference survey of the 'kind of music respondents like to hear' reveals that 18% Preferred 'rock and roll' and 18% Preferred 'serious music (classical).' J.A. 354. if WEFM's format is unique, therefore, its abandonment in favor of rock music would not bring service to a larger segment of the public and would leave that part of the classical music audience beyond the reach of WNIB without any service, except as WFMT may be found to fill the void
 
 
 [47]
 The FCC describes the proposed donee as a non-profit corporation operating educational television stations in Chicago. Its menbership was said to be 'composed of some 38 colleges, universities, schools, libraries, etc., as members and some 53 other educational, religious, research, civic, and cultural organizations as associate members.' 21 FCC 2d at 403 (1970)
 
 
 [48]
 In addition to the passage quoted in the text, the FCC stated that '(a) grant of the application as amended, will make possible the continuation of a unique and valuable fine arts program service . . ..' Waiver of its interim policy against acting on applications filed during the pendency of its rule making on the subject of common ownership was predicated on 'the overriding importance of promoting educational broadcasting in the public interest.'
 
 
 [49]
 In addition, we refer to Zenith's 1970 application for renewal of its current license for WEFM. See J.A. 115. Question 8 of the application asks 'how and to what extent (if any) applicant's station contributed during the past license period to the over-all diversity of program services available in the area or communities served.' Zenith responded as follows:
 There are upwards of 25 commercial FM stations in the Chicago area. Only one major station other than WEFM offers classical music to the extent that we do. Adherence to our classical music format provides a choice for lovers of fine music. Changing our basic programming would inevitably lessen the over-all diversity of program services available in this area. From the WNIB program guide, made a part of the record in this case, Zenith's reference would appear to be to that station, thus indicating that Zenith itself did not consider WFMT a 'classical music' station. In any event, WEFM's representation to the FCC that its present format enhances diversity requires explanation if abandonment of that format is predicated upon the notion that diversity will not be lessened. The explanation may well lie in the breadth of the term 'classical music,' if that rubric is used so broadly as to cover formats that do not substantially overlap. One station might not, for example, play music composed in this
 century, while another might concentrate on twentieth century works. In popular parlance both would be termed 'classical music' stations, yet the loss of either would unquestionably lessen diversity in the area.
 
 
 [50]
 The difference is explained by the fact that Zenith had offsetting income from its other enterprises and thus was able to deduct its losses in determining taxable income, thereby reducing tax liability by approximately one half the amount of its broadcasting loss
 
 
 [51]
 Cf. Bilingual Bicultural Coalition of Mass Media, Inc. v. FCC, 160 U.S.App.D.C. 390, 393, 492 F.2d 656, 659 (1974)
 
 
 [52]
 The authority granted the FCC in Section 309(d)(2) to dispose of a petition without a hearing was directed at 'petitions which were of no real consequence.' H.Rep.No.1800, 86th Cong., 2d Sess. 12 (1960), U.S.Code Cong. & Admin.News, p. 3520. See Hudson Valley Broadcasting Corp. v. FCC, 116 U.S.App.D.C. 1, 320 F.2d 723, 727 (1963)
 
 
 [53]
 40 FCC 2d 230. There is no doubt that the Commission has adopted the view there expressed. It appears in the Programming Policy Statement, 25 Fed.Reg. 7293 (1960), and is quoted at length in the FCC's brief to this court
 
 
 [54]
 See, in this regard, Judge Wilkey's recent opinion for the court in Hawaiian Telephone Co. v. FCC, 162 U.S.App.D.C. 229, 498 F.2d 771, 776-777 (1974)
 
 
 [55]
 It cannot be otherwise when it is remembered that the radio channels are priceless properties in limited supply, owned by all of the people but for the use of which the licenses pay nothing. If the marketplace alone is to determine programming format, then different tastes among the totality of the owners may go ungratified. Congress, having made the essential decision to license at no charge for private operation as distinct from putting the channels up for bids, can hardly be thought to have had so limited a concept of the aims of regulation. In any event, the language of the Act, by its terms and as read by the Supreme Court, is to the contrary
 
 
 [56]
 Our disposition of this case makes it unnecessary presently to measure the adequacy of the FCC's minimum notice requirement, which need not alert the public directly to the fact that a proposed license assignment encompasses a format change, against the constitutional rule that, 'within the limits of practicability,' due process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). We have had previous occasion to note that 'the question as to the adequacy of the notice does not evoke the principle of judicial deference to administrative expertise,' Ridge Radio Corp. v. FCC, 110 U.S.App.D.C. 277, 292 F.2d 770, 773 (1961), but we will give the question full attention only in a case where constitutional considerations cannot be avoided. The FCC's present notice requirement may in any event be so related to its expressed reluctance to consider matters of format, much less raise the 'ominous threat of a hearing,' that reexamination by the agency in light of this opinion's explication of the public interest standard will make such consideration unnecessary in the future as well
 
 
 [1]
 The Citizens Committee to Keep Progressive Rock v. F.C.C., 156 U.S.App.D.C. 16, 478 F.2d 926 (1973)
 
 
 [1]
 See Zenith Radio Corp., 40 F.C.C.2d 223, 230 (1973) (Additional Views of Chairman Burch, in which Comm'rs R. E. Lee, H. R. Lee, Reid, Wiley & Hook join); cf. id. 38 F.C.C.2d 838, 846 (1972)
 
 
 [2]
 Citizens Comm. to Save WEFM v. FCC, 165 U.S.App.D.C. at , 506 F.2d 246 at 252 (1973), (Bazelong, C.J.)
 
 
 [3]
 I do not read the Court in this case as ruling on the weight to be given considerations of diversity or on the degree of increase or decrease in diversity which requires denial of a petition for assignment of a hearing. Most importantly, I do not read the Court as foreclosing inquiry into the proper proceeding for consideration of diversity, i.e. whether diversity should be considered in both comparative and non-comparative proceedings
 
 
 [4]
 Judge Robb joined only in Part II of my opinion for the original panel which he sets forth in his dissent herein. But that Part must be read in connection with Parts III and IV of my panel opinion which enunciated my concern that regulation resigned to achieve diversity raised certain First Amendment issues and in which Judge Robb did not join
 I also join in the Court's inplicit holding that 309(e) may require a hearing on mixed questions of fact and law where the law is not settled and the facts might not otherwise require a hearing. Cf. Citizens TV Protest Comm. v. FCC, 121 U.S.App.D.C. 50, 348 F.2d 56 (1965). I particularly join in the intimation in note 35 of the Court's opinion and would state even more strongly than the Court that the FCC procedural policy in this area needs thorough reconsideration.
 
 
 [5]
 47 U.S.C. 402(b) (1970)
 
 
 [6]
 Citizens TV Protest Comm. v. FCC, 121 U.S.App.D.C. 50, 348 F.2d 56 (1965); Clarksburg Publishing Co. v. FCC, 96 U.S.App.D.C. 211, 225 F.2d 511 (1955). See United States v. Midwest Video Corp., 406 U.S. 649, 665-670, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971); Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 180 F.2d 28 (1950). See also Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 241, 230 F.2d 204, 209, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956) (Bazelon, J. dissenting); Scripps-Howard Radio v. FCC, 89 U.S.App.D.C. 13, 189 F.2d 677, cert. denied, 342 U.S. 830, 72 S.Ct. 55, 96 L.Ed. 628 (1951)
 
 
 [7]
 See 47 C.F.R. 73.131-.138; .231-.240; .35; .658; .636 (1974); FCC Dkt. #18110; Hale v. FCC, 138 U.S.App.D.C. 125, 425 F.2d 556 (1970); Frontier Broadcasting Co. 27 F.C.C.2d 486 (1971). See also United States v. Midwest Video Corp., 406 U.S. 649, 665-670, 92 S.Ct. 1860, 1869-1871, 32 L.Ed.2d 390 (1972); Metropolitan Television Co. v. FCC, 110 U.S.App.D.C. 133, 289 F.2d 874 (1961); Carter Mountain Transmission Corp. v. FCC, 116 U.S.App.D.C. 93, 321 F.2d 359, cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963); Carroll Broadcasting Co. v. FCC, 103 U.S.App.D.C. 346, 258 F.2d 440 (1958); Simmons v. FCC, 83 U.S.App.D.C. 262, 169 F.2d 670, cert. denied, 335 U.S. 846, 69 S.Ct. 67, 93 L.Ed. 396 (1948); Chicagoland TV Co., 11 F.C.C.2d 119, 136-137 (1967) (Hearing Exam.); Note, Toward Community Ownership of Cable Television, 83 Yale L.J. 1708 (1974). The FCC also considers ownership diversification as a factor in comparative licensing proceedings. See Policy Statement on Comparative Broadcast
 Hearings, 1 F.C.C.2d 393, 394-396 (1965); cases cited note 6 supra; Note, Diversification and the Public Interest: Administrative Responsibility of the FCC, 66 Yale L.J. 365 (1957).
 
 
 [8]
 Clarksburg Publishing Co. v. FCC, 96 U.S.App.D.C. 211, 218, 225 F.2d 511, 518 (1955), citing Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) and Cowles Broadcasting Co., 10 P & F Radio Reg. 1289, 1314 (1954). See also TV 9, Inc. v. FCC, 161 U.S.App.D.C. 349, 495 F.2d 929, 935-938 (1973)
 
 
 [9]
 There can be little doubt at this late date that artistic or entertainment programming is within the scope of the First Amendment. See Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974); Jacobellis v. Ohio, 378 U.S. 184, 191, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Brennan, J.); Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); Chafee, Book Review, 62 Harv.L.Rev. 891, 896 (1947). See also United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); Hannegan v. Esquire, Inc., 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586 (1946); S. Morison, Oxford History of the American People, 292, 472, 912-913 (1965)
 
 
 [10]
 See Banzhaf v. FCC, 132 U.S.App.D.C. 14, 32 n. 76, 405 F.2d 1082, 1100 n. 76 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). Furthermore, too much diversification of ownership may result in the production of licensees who do not have sufficient capital to create high quality entertainment or public affairs programming. See also Levin, Competition, Deversity and the Television Group Ownership Rules, 70 Colum.L.Rev. 791 (1970)
 
 
 [11]
 Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974)
 
 
 [12]
 United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943), aff'd, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 353-354, 473 F.2d 16, 64-65 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973); Business Executives' Move for Vietnam Peace v. FCC, 146 U.S.App.D.C. 181, 193-197, 450 F.2d 642, 654-658 (1971), rev'd sub nom., Columbia Broadcasting System, Inc. v. Democratic National Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)
 
 
 [13]
 While the 'market place of ideas' justification for unrestricted speech is the most consistently applied, other justifications for unrestricted speech are also persuasive. As Professor Emerson has suggested, unrestricted speech is inextricably bound up in an individual's search for self-fulfillment and truth. See T. Emerson, The System of Freedom of Expression 6-7 (1970), applied in part, Banzhaf v. FCC, 132 U.S.App.D.C. 14, 34, 405 F.2d 1082, 1102 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); Business Executives' Move for Vietnam Peace v. FCC, 146 U.S.App.D.C. 181, 194, 450 F.2d 642, 655 (1971), rev'd sub nom., Columbia Broadcasting System, Inc. v. Democratic National Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). Furthermore, the right of unrestricted speech seems inherent in elementary notions of physical freedom, such as freedom to travel, to use contraceptives, to have abortions, to worship the god of one's choice, to learn a foreign language, to send one'schildren to private schools, to associate freely with persons of one's choice and to hold property and engage in economic activity. See Tribe, Forward: Toward a Model of Roles in the Due Process of life and Law, 87 Harv.L.Rev. 1, 33-50 (1973); Pound, A Survey of Social Interests, 57 Harv.L.Rev. 1, 33-35 (1943). Finally both of these two alternative justifications for unrestricted speech are buttressed by reference to the common law principle that no person should be punished unless he or she has performed an act. See Robinson v. California, 370 U.S. 660, 678-679, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (Harlan, J. concurring); Ex parte Burford, 7 U.S. (3 Cranch,) 448, 2 L.Ed. 495 (1806). These notions of free speech as part of basic human dignity are not fully applicable to the operations of governmental licensees in the broadcast field. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 388, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)
 
 
 [14]
 Columbia Broadcasting System, Inc. v. Democratic National Comm., 412 U.S. 94, 145, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Stewart, J. concurring)
 
 
 [15]
 Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 356, 473 F.2d 16, 67 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973) (Bazelon, C.J. dissenting)
 
 
 [16]
 Of course not all speech is protected. See id., 153 U.S.App.D.C. at 354 n. 7, 473 F.2d at 65 n. 7. Particularly significant for telecommunications, advertising is not considered to be protected speech. Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)
 
 
 [17]
 See Hannegan v. Esquire, Inc., 327 U.S. 146, 157-158, 66 S.Ct. 456, 90 L.Ed. 586 (1946). Cf. Paris Adult Theatre I v. Slaton, 413 U.S. 49, 73, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (Brennan, J. dissenting)
 
 
 [18]
 See House Comm. on Interstate and Foreign Commerce, Report on Network Broadcasting, H.R.Rep.No.1297, 85th Cong., 2d Sess. (1958). On FCC inconsistency and evasion in enforcing the diversification guides, see Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 241, 230 F.2d 204, 209, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956) (Bazelon, J. dissenting) H. Friendly, The Federal Administrative Agencies 66-67 (1962); Schwartz, Comparative Television and the Chancellor's Foot, 47 Geo.L.J. 655, 673-678, 690-694 (1959); see also H. Geller, A Modest Proposal to Reform the Federal Communications Commission 3-12 (Rand Corp. 1974) (describing FCC policy on development of UHF and VHF bands)
 
 
 [19]
 See sources cited note 40 infra. The concept of 'licensee responsibility' has been employed recently in a manner strongly suggestive of censorship. See Yale Broadcasting Co. v. FCC, 155 U.S.App.D.C. 390, 399, 478 F.2d 594, 603, cert. denied, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973) (Statement of Bazelon, C.J.). For a definitive discussion of the problem of network domination of programming, see Federal Communications Comm'n, Network Program Procurement, H.R.Rep.No.281, 88th Cong., 1st Sess. (1963); Barrow, The Attainment of Balanced Program Service in Television, 52 Va.L.Rev. 633, 660-663 (1966)
 
 
 [20]
 See generally Crowder v. FCC, 130 U.S.App.D.C. 198, 201-202, 399 F.2d 569, 572-573, cert. denied, 393 U.S. 962, 89 S.Ct. 400, 21 L.Ed.2d 375 (1968), aff'g, Harriman Broadcasting Co., 9 F.C.C.2d 731 (1967); 47 C.F.R. 1.597 (1973); Moline Television Corp., 31 F.C.C.2d 263, 297-298 (1971) (Johnson, Comm'r, dissenting)
 
 
 [21]
 Cf. Hannegan v. Esquire, Inc., 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586 (1946); American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902); cases cited note 8 supra
 
 
 [22]
 See also Business Executives' Move for Vietnam Peace v. FCC, 146 U.S.App.D.C. 181, 450 F.2d 642 (1971), rev'd sub nom., Columbia Broadcasting System, Inc. v. Democratic National Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)
 
 
 [23]
 National Broadcasting Co. v. United States, 319 U.S. 190, 217, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943)
 
 
 [24]
 Columbia Broadcasting System, Inc. v. Democratic National Comm., 412 U.S. 94, 105-114, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)
 
 
 [25]
 47 U.S.C. 326 (1970)
 
 
 [26]
 Compare the Court's formulation with the language of Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969): 'It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.'
 
 
 [27]
 I have recently noted that technological changes, particularly the emerging cable television technology, may eliminate these limits on the FCC's ability to increase the number of licensees serving a particular market. Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 364-365, 473 F.2d 16, 75-76 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973) (Bazelon, C.J. dissenting). See also Robinson, The FCC and the First Amendment, 52 Minn.L.Rev. 67, 157-161 (1967); note 29 infra
 
 
 [28]
 The FCC is required by law to allocate scarce frequencies by a licensing process. 47 U.S.C. 301-310 (1970). The financial requirements have been established by the Commission in the exercise of its discretion pursuant to the licensing power. See Ultravision Broadcasting Co., 1 F.C.C.2d 544 (1965); Chicagoland TV Co., 11 F.C.C.2d 96 (Rev.Bd.1967)
 
 
 [29]
 National Broadcasting Co. v. United States, 319 U.S. 190, 210-213, 63 S.Ct. 997, 87 L.Ed. 1344 (1946). Of course, Congress could have chosen a different scheme to rectify this anarchy which would have permitted the FCC to increase the number of speakers ad infinitum. If Congress had chosen to make the licensee a common carrier, then there would be no scarcity since the only scarcity in broadcasting is in the frequencies; there is almost no scarcity of broadcast time. Thus, by permitting access to the broadcasting facilities by anyone who can pay the charge, Congress could have avoided most if not all of the treacherous problems courts must face in reconciling the First Amendment and the present system of telecommunication regulation. I note with some interest that the Commission has under consideration proposals to make cable television at least partially into a common carrier. See 47 C.F.R. 76.251 (1973)
 
 
 [30]
 See notes 18-20 supra
 
 
 [31]
 Banzhaf v. FCC, 132 U.S.App.D.C. 14, 32-33, 405 F.2d 1082, 1100-1101 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), cited in Columbia Broadcasting System, Inc. v. Democratic National Comm., 412 U.S. 94, 128, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)
 
 
 [32]
 See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 368 n. 65, 473 F.2d 16, 79 n. 65 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 33 n. 77, 405 F.2d 1082, 1101 n. 77 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 386-387 & n. 15, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), citing Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949)
 The particular nature of telecommunications largely presents a conflict between privacy interests and free speech. See Pollak v. Public Utilities Comm'n, 89 U.S.App.D.C. 94, 191 F.2d 450 (1951), rev'd, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). However, the conflict between privacy and the First Amendment is not limited to telecommunications. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 3008-3010, 41 L.Ed.2d 789 (1974); Hunter v. Washington Post, Civil No. 8865-73 (D.C.Super. July 12, 1974) (newspaper cannot print the name of rape victims); Note, Privacy in the First Amendment, 82 Yale L.J. 1462 (1973).
 I do not believe that the pervasive, intrusive nature of telecommunications offers the FCC carte blanche for regulation. See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. at 368, 473 F.2d at 79 (Bazelon, C.J. dissenting); Robinson, supra note 27 at 154-56. Rather each regulatory action must be meansured against the nature of telecommunications to ensure that the action in the particular case is justified by that nature.
 
 
 [33]
 See Columbia Broadcasting Systems, Inc. v. Democratic National Comm., 412 U.S. 94, 148, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Douglas J. concurring)
 
 
 [34]
 Another area in which the specter of failures in the traditional First Amendment structure has caused some movement away from the strict rule of a multitude of tongues unrestricted in speech to some direct actions designed to promote diversity of ideas is that of money and the electoral process. See generally Local 562, Pipefitters v. United States, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); United States v. International Union, Auto Workers, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957). Cf. United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). Perhaps, Red Lion's narrow holding can be explained as an extension of these cases. Compare note 56 infra. I have recently struggled with the difficult constitutional problems in this area, see American Civil Liberties Union v. Jennings, 366 F.Supp. 1051 (D.D.C.1973), prob. juris. noted sub nom., Staats v. American Civil Liberties Union, 417 U.S. 944, 94 S.Ct. 3066,
 
 
 [41]
 L.Ed.2d 664 (1974), and have noted the recent guilty pleas entered by individuals and corporations for conduct which on its face at least seems within First Amendment protection. In this area too courts are forced to reconcile traditional notions of the First Amendment with modern notions of equal access. I am reminded of John Randolph's famous assertion: 'I love liberty: I despise equality.' That statement surely is no longer representative of our constitutional order
 
 
 [35]
 See Primer on Ascertainment of Community Problems by Broadcast Applicants, 36 Fed.Reg. 4092 (F.C.C.1971); Suburban Broadcasters, 30 F.C.C. 1021 (1961), aff'd sub nom., Henry v. FCC, 112 U.S.App.D.C. 247, 302 F.2d 191, cert. denied, 371 U.S. 821, 83 S.Ct. 37, 9 L.Ed.2d 60 (1962) (Bazelon, C.J.). This requirement can be administered in a manner which suggests actual programming control, see Lee Roy McCourry, 2 P & F Radio Reg.2d 895 (1964), discussed Robinson, supra note 27, at 115, 123-124, but on its face, the requirement seeks only to force the licensee to base his or her decisions on a complete and accurate record
 
 
 [36]
 The meaning of this term is a subject of intense debate, compare Neckritz v. FCC, 163 U.S.App.D.C. 409, 502 F.2d 411 (1974) with Friends of the Earth v. FCC, 146 U.S.App.D.C. 88, 449 F.2d 1164 (1971), but it apparently does not include entertainment programming. See applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598, 600-604 (1964). Of course, some entertainment programming may specifically raise political issues, which are 'controversial', but normally the choice between classical music and rock music would not be a 'controversial issue.' Cf. George D. Corey, 25 P & F Radio Reg.2d 437 (1972); Children Before Dogs, 25 P & F Radio Reg.2d 411 (1972). I have serious doubts about the validity and rationality of current definitions of 'controversiality' and do not in this opinion mean to approve those difinitions
 
 
 [37]
 See Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1254-1255 (1949); Columbia Broadcasting System, Inc., 20 F.C.C.2d 143 (1969); Columbia Broadcasting System, Inc., 30 F.C.C.2d 150 (1971). See generally Note, The First Amendment and Regulation of Television News, 72 Colum.L.Rev. 746 (1972)
 
 
 [38]
 See Trinity Methodist Church, South v. Federal Radio Comm'n, 61 U.S.App.D.C. 311, 62 F.2d 850, cert. denied, 288 U.S. 599, 53 S.Ct. 317, 77 L.Ed. 975 (1932). Cf. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). See also Palmetto Broadcasting Co., 23 P & F Radio Reg. 483 (1961), aff'd sub nom. on other grounds, Robinson v. FCC, 118 U.S.App.D.C. 144, 334 F.2d 534, cert. denied, 379 U.S. 843, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964) (reasonable care in ascertaining the nature of the programming actually transmitted by agents of the licensee)
 
 
 [39]
 See generally Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973); Applicability of the Fairness Doctrine in the Handling of Controverial Issues of Public Importance, 40 F.C.C. 598 (1964)
 
 
 [40]
 See KFKB Broadcasting Ass'n v. Federal Radio Comm'n, 60 U.S.App.D.C. 79, 47 F.2d 670 (1931). Cf. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); Gordon Broadcasting Co., 24 P & F Radio Reg. 315 (1962); Commercial Practises of Broadcast Licensees, 1 P & F Radio Reg.2d 1606 (1964) (FCC actions to prevent over-commercialization of broadcast frequencies). This sort of regulation would seemingly be justified by Pittaburg Press Co. v. Human Relations Comm'n, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) and cases cited therein. See also Objectionable Loudness of Commercials, 5 P & F Radio Reg.2d 1621 (1965); sources cited note 32 supra
 Another aspect of this duty is the licensee's duty not to delegate its control over programming to the networks, a duty reflected in the Prime Time Access Rule, 47 C.F.R. 73.658 (1974), the prohibition on chain broadcasting, National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed.2d 1344 (1943), the prohibition on network representation of affiliated stations in the sale of nonnetwork advertising time, Metropolitan Television v. FCC, 110 U.S.App.D.C. 133, 289 F.2d 874 (1961) and the requirement of local origination of CATV programming, United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). See Simmons v. FCC, 83 U.S.App.D.C. 262, 169 F.2d 670, cert. denied, 335 U.S. 846, 69 S.Ct. 67, 93 L.Ed. 396 (1948); Churchill Tabernacle v. FCC, 81 U.S.App.D.C. 411, 160 F.2d 244 (1947); Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1248 (1949).
 
 
 [41]
 Cf. Associated Press v. NLRB, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937); Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Buckley v. American Fed'n of Television & Radio Artists, 496 F.2d 305 (2d Cir. 1974)
 
 
 [42]
 See Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1249-50 (1949). Of course, the licensee's judgment as to whether a particular program is controversial and thus whether he must present more than one 'side' is reviewable by the FCC only under a standard of reasonableness. See National Broadcasting Co. v. FCC, No. 73-2256 (D.C.Cir. Sept. 27, 1974). However, the problem of ascertaining what are the various 'sides' to a particular issue and the problem of being forced to air that 'side' remain an inhibiting element
 
 
 [43]
 See H. Geller, The Fairness Doctrine in Broadcasting 19-20 (Rand Corp. 1973), discussing Letter to the Honorable Oren Harris, 40 F.C.C. 582 (1963); Tri-State Broadcasting Co., 40 F.C.C. 508 (1962). For recent examples, see National Broadcasting Co., 16 F.C.C.2d 956 (1969); Scalia, Don't Go Near the Water, 25 Fed.Com.B.J. 111 (1972)
 
 
 [44]
 See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 373-375, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The 'equal time' requirement is specifically mandated by 47 U.S.C. 315 (1970)
 
 
 [45]
 See Citizens Communication Center v. FCC, 145 U.S.App.D.C. 32, 44, 447 F.2d 1201, 1213 (1971), clarified, 149 U.S.App.D.C. 419, 463 F.2d 822 (1972); Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants, 22 F.C.C.2d 424 (1970); Goldberg, A Proposal to Deregulate Broadcast Programming, 42 Geo.Wash.L.Rev. 73, 83-84 (1973). See also Network Programming Inquiry, 25 Fed.Reg. 7291 (F.C.C. 1960), incorporated, Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 397 (1965); Note, Regulation of Program Content by the FCC, 77 Harv.L.Rev. 701, 704-06 (1964)
 
 
 [46]
 141 U.S.App.D.C. 109, 436 F.2d 263 (1970)
 
 
 [47]
 Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974)
 
 
 [48]
 New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)
 
 
 [49]
 See 47 U.S.C. 309(d)(1) (1970); 47 C.F.R. 1.580(i) (1973)
 
 
 [50]
 See Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598, 600 (1964)
 
 
 [51]
 See 47 C.F.R. 1.591(a)(1) (1973); Citizens Communication Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971); Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393 (1965)
 
 
 [52]
 See note 27 supra
 
 
 [53]
 The duties discussed in notes 35-41 would, however, be applicable
 
 
 [54]
 Columbia Broadcasting System, Inc. v. Democratic National Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)
 
 
 [55]
 Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974)
 
 
 [56]
 See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 359-560, 473 F.2d 16, 70-71 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973). This limitation may be justified by the fact that a personal attack may involve quasilibelous speech and thus a right to reply can be seen as a permissable remedy for such unprotected speech. See Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974) (brennan, J., concurring). The editorial reply rules might be justified by a desire to protect the electoral processes from control by dominant groups. See note 34 supra; 47 U.S.C. 315 (1970). Both may be justified as narrowly defined instances of intervention to protect compelling governmental interests. Cf. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 28-31, 405 F.2d 1082, 1096-99 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). Compare Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)
 
 
 [57]
 I digress to note that there may be no justification for the assumption of scarcity inherent in the concept of comparative licensing. I have suggested before and continue to suggest that the FCC, Congress and the courts reconsider this assumption. See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 364-365, 473 F.2d 16, 75-76 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973). Since there has been no reconsideration of the assumption of scarcity, I am forced for the time being to rule on the basis of that assumption. But the least we should require is that scarcity be proven in the particular case before erecting duties around that concept. See id
 I note that the FCC in its recent statement on the Fairness Doctrine and Public Interest Standards, 39 Fed.Reg. 26372, 26374 (1974), responds to my suggestion in Brandywine to reconsider the assumption of scarcity. However, that reconsideration consists of no more than a recital of the information presented in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 396-400, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). I would require a much broader inquiry than this before resting comfortably with the assumption of scarcity.
 
 
 [58]
 There is a distinction between normal comparative proceedings among various applicants in the same location for the same frequency and a 307(b) hearing on mutually inconsistent applications for licenses in different cities on different frequencies. However, in both circumstances choice of programming is relevant
 
 
 [59]
 W. S. Butterfield Theatres, Inc. v. FCC, 99 U.S.App.D.C. 71, 77, 237 F.2d 552, 558 (1956); Johnston Broadcasting Co. v. FCC, 85 U.S.App.D.C. 40, 48, 175 F.2d 351, 359 (1949); Bay State Beacon, Inc. v. FCC, 84 U.S.App.D.C. 216, 217, 171 F.2d 826, 827 (1948); Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 397 (1965)
 
 
 [60]
 See cases cited Jorgensen, Schwartz & Woods, Programming Diversity in Proposals for New Broadcast Licenses, 32 Geo.Wash.L.Rev. 769, 796-98 nn. 111, 113-14 (1964); Irion, FCC Criteria for Evaluating Competing Applicants, 43 Minn.L.Rev. 479, 489-96 (1959); Note, supra note 45 at 702. See also Buckley-Jaeger Broadcasting Corp. v. FCC, 130 U.S.App.D.C. 90, 397 F.2d 651 (1968)
 
 
 [61]
 See Moline Television Corp., 31 F.C.C.2d 263, 272-73 (1971), discussing Policy Statement on Comparative Broadcast Hearings, F.C.C.2d 393, 397 (1965). The statements in Moline to the effect that the FCC will no longer consider proposed programming specifically exempt consideration of programming proposals designed to meet unfulfilled community needs. 31 F.C.C.2d at 272; see note 63 infra
 
 
 [62]
 See, e.g., Central Coast Television, 1 P & F Radio Reg.2d 237 (1963); Jefferson Standard Broadcasting Co., 24 P & F Radio Reg., 319 (1963); Rockland Broadcasting Co., 23 P & F Radio Reg. 789 (1962); Plainview Radio, 18 P & F Radio Reg. 671 (1959)
 
 
 [63]
 See Rollins Broadcasting, Inc., 20 P & F Radio Reg. 976 (1960), mod. 20 P & F Radio Reg. 978 (1961); Herbert Muschel, 33 F.C.C. 48 (1961); La Fiesta Broadcasting Co., 6 F.C.C.2d 65 (Rev.Bd.1966); Great Lakes Television, Inc., 25 F.C.C. 470 (1958); NTA Television Broadcasting Corp., 22 P & F Radio Reg. 273, 294 n. 20 (1961); Broadman Broadcasting Co., 10 F.C.C.2d 422 (Rev.Bd. 1967); Mel-Lin, Inc., 17 F.C.C.2d 705, 712 (Rev.Bd.1969); Progress Broadcasting Corp., 24 P & F Radio Reg. 229 (Rev.Bd. 1962); Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 397 n. 9 (1965)
 
 
 [64]
 Compare Network Programming Inquiry, 25 Fed.Reg. 7291, 7295 (F.C.C.1960) with Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 397 (1965). While there is general commentary in the literature to the effect that the FCC does not in its review of programming perceptibly distintinguish between comparative and non-comparative proceedings, I was unable to find one non-comparative case in which the FCC gave significant consideration to a proposal for specialized programming. The cases cited note 63 supra involving comparative hearings, on the other hand, to demonstrate significant consideration of specialized programming proposals
 
 
 [65]
 Johnston Broadcasting Co. v. FCC, 85 U.S.App.D.C. 40, 48, 175 F.2d 351, 359 (1949)
 
 
 [66]
 Cf. cases cited note 59 supra. See also Buckley-Jaeger Broadcasting Corp. v. FCC, 130 U.S.App.D.C. 90, 397 F.2d 651 (1968), aff'g 2 F.C.C.2d 833 (1966)
 
 
 [67]
 Cf. FTC v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). Compare Citizens Communication Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971)
 
 
 [68]
 Cf. Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 271, 285, 53 S.Ct. 627, 77 L.Ed. 1166 (1933); p. 13 supra
 
 
 [69]
 'It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official-- as by requiring a permit or license which may be granted or withheld in the discretion of such official-- is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.'
 394 U.S. at 151, 89 S.Ct. at 939, citing Staub v. Baxley, 355 U.S. 313, 322, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958). See NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); American Civil Liberties Union v. Jennings, 366 F.Supp. 1041 (D.D.C.1973), prob. juris. noted sub nom., Staats v. American Civil Liberties Union, 417 U.S. 944, 94 S.Ct. 3066, 41 L.Ed.2d 664 (1974); Note, Chilling Effect in Constitutional Law, 69 Colum.L.Rev. 808 (1969). There is some evidence that broadcasters may want this 'chilling effect' in order to reaffirm their own predelictions for self-censorship. This is not an argument for permitting the government's 'chilling effect'; indeed, this argument is another persuasive reason for eliminating the government imposed 'chill.' See generally Yale Broadcasting Co. v. FCC, 155 U.S.App.D.C. 390, 399, 478 F.2d 594, 603, cert. denied, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973) (Statement of Bazelon, C.J.).
 The most potent source of a 'chill' lies in FCC actions which might if properly executed be consistent with the First Amendment but which are in fact executed in a manner strongly suggestive of censorship. See id.; note 35 supra. Another source of 'chill' is the threat of a hearing on a particular action of the licensee. This 'chill' is less visible in comparative proceedings since normally a hearing must be held in all such proceedings. See Citizens Communication Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971); Robinson, supra, note 27, at 117.
 
 
 [70]
 North Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, 414 U.S. 156, 167, 94 S.Ct. 407, 414, 38 L.Ed.2d 379 (1973)
 
 
 [71]
 I saw the need for such an over-sight in Yale Broadcasting Co. v. FCC, 155 U.S.App.D.C. 390, 399, 478 F.2d 594, 603, cert. denied, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973) (Statement of Bazelon, C.J.). Compare notes 38, 40 supra
 
 
 [72]
 See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 393, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)
 
 
 [73]
 See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)
 
 
 [74]
 See California Bankers' Ass'n v. Schultz, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974)
 
 
 [75]
 See, e.g., Bazelon, The Defective Assistance of Counsel, 42 U.Cinc.L.Rev. 1 (1973)
 
 
 [76]
 See Joseph v. FCC, 131 U.S.App.D.C. 207, 404 F.2d 207 (1968); Witchita-Hutchinson Co., 19 F.C.C.2d 433 (1969), explained Alianza Federal de Pueblos Libres', 31 F.C.C.2d 557, 559 (1971); Time-Life Broadcast, Inc., 33 F.C.C.2d 1099, 1114-25 (1972) (in context of 'Top 50' policy). Such a view of the Commission's responsibilities in license assignment proceedings is consistent with the language and intent of 47 U.S.C. 310(b) (1970). That section requires the FCC to determine whether the assignment is in the public interest, thus by implication authorizing a comparison between existing service and proposed service. The proviso which prevents the FCC from considering other applicants refers only to other proposed assignees and not to the assignor. If a license assignment is considered a comparative proceeding, it would not necessarily follow that a hearing need be held in every case under the Ashbacker doctrine. See generally Citizens Communication Center v. FCC, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971). Since the assignor, who is to be compared in the assignment proceeding, initiates that proceeding and since by the nature of the proceeding the assignor would have all relevant procedural rights in a potential comparison of it and the assignee, the considerations of fairness which underlie the Ashbacker doctrine would seemingly not be applicable
 
 
 [77]
 See note 63 supra
 
 
 [78]
 See pp. 16-18 supra
 
 
 [79]
 See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 352, 473 F.2d 16, 63 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973) (Bazelon, C.J. dissenting). I take this opportunity to note that one of the chief vices, in my view, of the FCC decision in Brandywine was its failure to consider whether the Philadelphia area, served by sixty-odd stations, was diversified enough to permit specialized opinion programming, a type of programming the FCC apparently does not permit. It is not yet apparent to me why the FCC should permit specialized entertainment programming, and forbid specialized opinion programming. See also note 36 supra; Note, supra note 45, at 706. In this connection I not with much interest Senator Ervin's proposal to restrict application of the Fairness Doctrine to broadcast areas receiving four or fewer broadcast signals. See 119 Cong.Rec. S20358-62 (Nov. 14, 1973)
 
 
 [1]
 See Citizens Committee to Preserve the Voice of the Arts in Atlanta v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970); Hartford Communications Committee v. FCC, 151 U.S.App.D.C. 354, 467 F.2d 408 (1972); Lakewood Broadcasting Service, Inc. v. FCC, 156 U.S.App.D.C. 9, 478 F.2d 919 (1973); Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.AppD.C. 16, 478 F.2d 926 (1973)
 
 
 [2]
 Citizens Committee to Keep Progressive Rock, 478 F.2d at 929
 
 
 [3]
 Lakewood Broadcasting Service, Inc., 478 F.2d at 922
 
 
 [4]
 Id
 
 
 [5]
 Appellants' brief, at 38
 
 
 [6]
 Citizens Committee to Keep Progressive Rock, 478 F.2d at 929
 
 
 [7]
 Id. at 929
 
 
 [8]
 A third classical music station, WNIB-FM, currently serves a smaller part of the Chicago area. GCG has agreed that if their license application is approved, they will relinquish the call letters WEFM to WNIB and give WNIB the WEFM classical music library as well as technical assistance designed to enable WNIB to increase its power
 
 
 [9]
 The long history of WEFM's service does not diminish the impact of WFMT's similar programming. The length of time that a format has been on the air is usually relevant only when that format is unique. See Citizens Committee to Keep Progressive Rock, at 933 note 22:
 Naturally the length of time that a specific format has been on the air is a factor to be considered in the ultimate public interest determination, for it can have a direct bearing on the degree of attachment which the public has to the unique format.
 This approach to the diversity issue cannot be applied in a mechanistic fashion. Whether a format to be discontinued is unique can be a subtle question requiring that more than mere labels be examined. The fact, for example, that two stations are labelled 'classical' does not automatically mean that they provide substantially similar programming. One of the stations might never play music composed in this century, while the other devotes considerable amounts of time to such music. In this case, however, it is apparent that WEFM and WFMT have substantially similar programming, both covering a broad range of classical music. Cf. Citizens Committee to Keep Progressive Rock, at 932, where this Court noted that 'Top 40' stations cannot automatically be assumed to provide substantial amounts of 'progressive rock' music.
 
 
 [10]
 Zenith was not, for example, able to obtain enough advertising to fill the two and one-half minutes per hour it allotted for ads. Joint Appendix at 73
 Appellants' contention concerning the adequacy of the notice of the application for voluntary transfer is also without merit. The Commission properly found that Zenith complied with the notice requirements of the Commission's rules. The notice given was not constitutionally defective.
 Similarly, appellants' contention that the Commission's ex parte rules had an unconstitutional impact on the public discussion of the format change is without merit in the setting of this case.